**AMERICAN CYANAMID CO.**

v.

**UNITED STATES SURGICAL CORP.**

**Civ. No. 5:91CV–352(FBB).**

United States District Court,
D. Connecticut.

Nov. 30, 1992.

William H. Prout, William J. Doyle, Wiggin & Dana, New Haven, CT, Berj A. Terzian, John J. Lauter, Victor Balancia, Pennie & Edmonds, New York City, for plaintiff.

Ann H. Rubin, Anthony M. Fitzgerald, J. Christopher Rooney, Carmody & Torrance, New Haven, CT, Jay Paul McGrath, Clark E.

Walter, Bradford J. Badke, Dewey Ballantine, New York City, for defendant.

## RULING ON MOTION FOR PRELIMINARY INJUNCTION

ELLEN B. BURNS, Senior District Judge.

This infringement action involves United States Patent No. 4,135,622 ("the '622 patent"), entitled "Packaged, Desiccated Surgical Elements," which was issued on January 23, 1979 to American Cyanamid Company ("Cyanamid") as assignee of the inventor, Arthur Glick. This Court has jurisdiction over the subject matter under 28 U.S.C. § 1338(a), and venue is proper under 28 U.S.C. § 1400(b).

Cyanamid has moved for an order enjoining United States Surgical Corporation ("U.S. Surgical") *pendente lite* from making, using, or selling packaged synthetic absorbable sutures that infringe the '622 patent, which are marketed by U.S. Surgical under the brand name Polysorb. After an eight-day hearing to the Court, the parties' filing of post-hearing memoranda with proposed findings of fact and conclusions of law, and oral argument, and after considering the sufficiency, weight, and credibility of the testimony of the witnesses,[1] their demeanor on the stand, the documentary evidence admitted at the hearing,[2] and the post-hearing memoranda, the Court enters the following findings of fact and conclusions of law, which are embodied in this opinion as permitted by Fed.R.Civ.P. 52(a). For the reasons that follow, the Plaintiff's motion for a preliminary injunction is denied.

## FINDINGS OF FACT

### I. BACKGROUND

#### A. The Parties

1. Plaintiff American Cyanamid Company is a corporation organized and existing under the laws of the State of Maine with a place of business at Stamford, Connecticut. Cyanamid manufactures and sells a variety of chemical, agricultural, and medical products with sales in 1990 of $4.5 billion. (Compl. ¶ 3; DX BT).

2. Cyanamid, through its Davis & Geck division, manufactures and sells a competitive full-line of sutures used in medical surgical procedures. Cyanamid also markets other wound closure products, including external skin staplers and stainless steel needles. (Clifford Tr. 1188, 1190, 1192; PX 75 (IMS Market Data for Fixed Head and Rotating Head Skin Staplers); PX 83, at 20 (Cyanamid Annual Report (1990))). Davis & Geck's worldwide sales in 1990 were approximately [[ ]] ■ (Clifford Tr. 1191).

3. U.S. Surgical is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Norwalk, Connecticut. U.S. Surgical manufactures and sells a variety of competitive wound closure products and endoscopic instruments, including internal and external surgical stapling instruments, surgical clips, clip appliers, and trocars. (Knarr Tr. 1757–58; PX 82 (U.S. Surgical Annual Report (1990))). In March 1991 U.S. Surgical introduced a full-line of suture products, which are manufactured at its principal manufacturing facility in North Haven, Connecticut. (Knarr Tr. 1758, 1762–62; DX BQ).

4. U.S. Surgical has grown rapidly in recent years. From 1987 to 1990, its annual sales doubled from $252 million to $514 million, and sales for the first three quarters of 1991 exceeded $600 million. (Knarr Tr. 1758–59; PX 82, at 43).

#### B. The Witnesses

5. The following witnesses testified in behalf of Cyanamid in its case-in-chief or in rebuttal: Gabor B. Levy, Ph.D., a consultant in the scientific instruments field and editor

1. The transcript of the hearing shall be designated in this opinion by witness as "(__ Tr. _)."

2. Exhibits received into evidence at the hearing shall be designated as "PX" for the Plaintiff's exhibits and "DX" for the Defendant's exhibits.

of *American Laboratory and Biotechnology Lab* (PX 9); Elvira Longordo, Ph.D., an employee in the physical chemistry laboratory of the Scientific Services Department of Cyanamid; A. Charles Tanquary, Ph.D., a polymer chemist with over 35 years of experience in the field of polymer research and technology (PX 62); William K. Brandt, Ph. D., a marketing and sales management consultant (PX 74); John F. Clifford, Division Vice President of the Davis & Geck division of Cyanamid; Leo Gaudette, a Regional Sales Manager of the Davis & Geck division of Cyanamid; Dean Gulezian, a Sales Representative for the Davis & Geck division of Cyanamid; Martin Adelman, Professor of Law at the Wayne State University School of Law and editor of *Patent Law Perspectives* (PX 73); Michael Zeide, M.D., an orthopedic surgeon practicing in West Palm Beach, Florida; Chermeine Rivera, a chemist employed by Cyanamid; and Peter K. Jarrett, Ph.D., Associate Research Fellow of the Polymer Technology Group of Cyanamid.

6. The following witnesses testified in behalf of U.S. Surgical in opposition to the motion for a preliminary injunction: John R. Schaefgen, Ph.D., a consultant in the field of polymer chemistry with over 30 years of experience (DX T); David M. Wiles, Ph.D., a consultant and former head of the Division of Chemistry of the National Research Council of Canada with over 30 years of experience studying the kinetics of polymer reactions (DX U); Richard R. Geoffroy, an engineer with over 25 years of experience in test method development (DX S); John D. Corbitt Jr., M.D., Chairman of the Department of Surgery at J.F.K. Medical Center (DX Q); Donald S. Chisum, Professor of Law at the University of Washington School of Law and author of a seven-volume treatise on patent law (DX R); Donald Kaplan, Ph.D., U.S. Surgical's Vice President of Materials Research who developed the accused product, Polysorb; and Robert Knarr, U.S. Surgical's Vice President of Marketing.

## C. General Information—Sutures

7. There are seven types of sutures: catgut, silk, nylon, polypropylene, steel, Dacron, and synthetic absorbable. Sutures are man-

ufactured in many different sizes and are typically dyed, coated, and needled. (Tanquary Tr. 541–42; Knarr Tr. 1760–61; DX BQ).

8. A synthetic absorbable suture is made principally of a synthetic polymer, which is designed to hold tissue together for only a few weeks while healing occurs. Body moisture then breaks down the synthetic absorbable suture into components that the body can metabolize. (Tanquary Tr. 541; Kaplan Tr. 820; Wiles Tr. 1377–78; Knarr Tr. 1780). As such, synthetic absorbable sutures must retain stability and *in vivo* strength, yet deteriorate after the critical wound healing process. (Wiles Tr. 1378; Tanquary Tr. 550).

9. The term "synthetic polymer" refers to a long chain of material comprising small chemical building blocks usually made from petrochemical sources. (Tanquary Tr. 541; Kaplan Tr. 731; Wiles Tr. 1376–77).

10. Synthetic absorbable sutures are broken down in the body by a process called hydrolytic degradation. In this process, water attacks and breaks the ester linkages in the polymer chain to facilitate absorption into the body. (Tanquary Tr. 541, 549–50; Wiles Tr. 1378–79).

## D. The '622 Patent

11. The '622 patent relates to packaged synthetic absorbable surgical elements. Claim 1 of the '622 patent provides:

A package comprising an air-tight sealed container fabricated from a material which is substantially impervious to water vapor, said container having therein a storage stable sterile synthetic surgical element of a polymer subject to hydrolytic degradation to non-toxic, tissue-compatible absorbable components, said polymer having glycolic acid ester linkages, said storage stable sterile synthetic surgical element further characterized in that the absorbed water moisture in the sterile surgical element is at or less than 0.25% by weight of the sterile surgical element, in the sterile enclosure.

(PX 1, col. 21, 11.15–27; DX DP).

## E. Polysorb

12. Dr. Donald S. Kaplan, Vice President of Research at U.S. Surgical, developed the

Polysorb synthetic absorbable suture. (Kaplan Tr. 745, 772–73).

13. Polysorb is packaged in an airtight, water impervious foil package. (Kaplan Tr. 815; Tanquary Tr. 554; PX 64; PX 65).

14. Polysorb is a sterile synthetic absorbable suture composed primarily of a 90/10 copolymer of glycolic and lactic acids. (Kaplan Tr. 809, 828; Wiles Tr. 1376–77; Tanquary Tr. 555; PX 64).

15. Polysorb has glycolic acid ester linkages, (Wiles Tr. 1496), and also contains glycerin, a terpolymer coating, and water.

16. Polysorb is storage stable and subject to hydrolytic degradation to non-toxic tissue compatible absorbable components. (Tanquary Tr. 555–56; Wiles Tr. 1495; PX 64; PX 65).

17. After interpreting the meaning of surgical element, a principal issue is thus whether "the absorbed water moisture in the sterile surgical element is at or less than 0.25% by weight of the sterile surgical element."

18. The filaments in Polysorb are more numerous and smaller in diameter than those in competitive products, and they are braided differently, with an inner core of filaments and an outer braided portion. (Kaplan Tr. 750–59; Tanquary Tr. 562; Wiles Tr. 1376; PX 66; DX DU; DX DV; DX DW).

19. The glycerin, water, and 90/10 copolymer are in dynamic equilibrium within the Polysorb package. (Wiles Tr. 1393; DX FY). These components move rapidly throughout the system and hydrogen bond[3] with each other in multiple configurations. (Wiles Tr. 1389, 1391–93, 1403, 1408–11, 1434–36, 1450–51).

20. This equilibrium and interaction "no longer allows you to differentiate between water that's part of glycerin or water that's part of the polymer or water that's part of itself." (Wiles Tr. 1403, 1451, 1480–81). Consequently, the relative hygroscopicity of water, glycerin, and the 90/10 copolymer, standing alone, will not apply in a system

where water, glycerin, and the 90/10 copolymer are mixed together. (Wiles Tr. 1402–03, 1479–82).

21. The 90/10 copolymer of glycolic and lactic acid has crystalline and amorphous regions. (Kaplan Tr. 740, 810, 827, 911).

22. The crystalline regions lie randomly throughout the molecular structure of the suture filaments. (Kaplan Tr. 910). Within the crystalline regions, however, the molecules are in a tightly bound orientation so that essentially no spaces exist between the molecules. (Kaplan Tr. 740; Wiles Tr. 1365–66). Between the crystalline regions lie amorphous regions, which are "flexible spaghetti-like chains" without orientation. (Kaplan Tr. 740–41, 911; Wiles Tr. 1366). The crystalline regions in Polysorb "range from the high 30 percent level to 40[–]45 percent level," (Kaplan Tr. 810, 910), and the remainder is amorphous. (Kaplan Tr. 810). Both water and glycerin can enter the amorphous (but not the crystalline) regions of the polymer. (Kaplan Tr. 810, 911; Wiles Tr. 1393–94, 1475).

23. Crystallinity increases as the structure becomes closer to a homopolymer. (Kaplan Tr. 826–27). Although the crystallinity levels of a 100 percent homopolymer are slightly greater than those of a 90/10 copolymer, (Kaplan Tr. 740–41), Dr. Kaplan "found almost no differences in their behavior in terms of tensile strength or any other characteristics." (Kaplan Tr. 828–29).

24. Dr. Kaplan decided to use a 90/10 copolymer not only because of the absence of significant differences in its characteristics as compared to the homopolymer but also because the "90/10 is soluble in solvents that the 100 percent material is not, and it [was therefore] practical from a production point of view to have our products be soluble in solvents that are safe and easy to use in the manufacturing plant." (Kaplan Tr. 828).

25. The outside of the Polysorb suture is incompletely coated with a terpolymer comprising a mixture of glycolide/lactide copo-

---

3. Hydrogen bonding is the chemical process by which hydrogen atoms are attracted and bonded to either oxygen or nitrogen atoms. (Wiles Tr. 1379–80). In the case of Polysorb, since no nitrogen is present in the system, the hydrogen atoms in glycerin and water bond to the oxygen atoms in, *inter alia*, the polymer. (DX FY; Wiles Tr. 1379–80, 1391–92, 1434–35).

lymer, polyethylene oxide, and calcium lactate. *Compare* (Kaplan Tr. 848–49, 852; Wiles Tr. 1380–81, 1384; PX 20; PX 64) (confidential) *with* (Longordo Tr. 245–46; Tanquary Tr. 555–57). The coating is designed to provide "rundown characteristics" that allow knots to slide down the suture in order to secure the tissue. (Kaplan Tr. 764–65).

26. Once the terpolymer coating is applied and disrupted by the suture's passage between two rollers, glycerin [4] is added in an amount equal to approximately 10% by weight of the suture. (Kaplan Tr. 773–75, 852). (confidential). In addition to providing the desired level of flexibility, that level of glycerin was selected in order to facilitate the smooth removal of the suture from the package. (Kaplan Tr. 775–77, 779, 918–20; PX 53).

27. At the level manufactured, the glycerin initially existing throughout the Polysorb suture structure (including the braid, core, and polymer), will not surround every fiber. *Compare* (Tanquary Tr. 563–64; Levy Tr. 165–66) *with* (Kaplan Tr. 811–13; Wiles Tr. 1384, 1394). Hence, although the glycerin will initially contact and fill spaces between the filaments in Polysorb through capillary action (Kaplan Tr. 847–48, 854–61; Wiles Tr. 1390–91) and the concentration gradient,[5] there is an insufficient amount of glycerin in the Polysorb suture structure to fill all of the spaces between (and surround all of) the filaments. Once the capillary action has finished distributing the glycerin incompletely throughout the suture structure, "the present glycerin diffuses into the polymer itself." (Kaplan Tr. 860; Wiles Tr. 1384, 1454–55).

28. An unmeasured (and perhaps unmeasurable (Kaplan Tr. 860–61)) amount of glycerin will enter the amorphous regions of the polymer structure in the Polysorb suture. *Compare* (Tanquary Tr. 598–99, 582) *with* (Kaplan Tr. 810–11, 860, 863–65; Wiles Tr. 1384, 1391, 1393–94, 1437, 1455–57, 1475). This diffusion into the polymer results from the concentration gradient, the amount of glycerin in the system, and the hydrogen bonding of glycerin and the polymer. (Kaplan Tr. 860–61; Wiles Tr. 1391, 1437, 1452). All of the glycerin in the Polysorb suture system will be distributed at the molecular level, (Wiles Tr. 1408–09), with some molecules on the "surface," "some just inside, some of it just a little bit farther inside ...," (Wiles Tr. 1458), until there is no concentration gradient left. (Wiles Tr. 1458).

29. The rate of migration of a molecule will in part depend upon its size (or molecular weight). (Wiles Tr. 1483–84). Generally, "the rate of migration ... will be slower the larger the molecule gets." (Wiles Tr. 1483). Although glycerol is a larger molecule than water, (Tanquary Tr. 598), and although a rate/size correlation exists, "it's not a black or white thing. Big molecules will go [into the copolymer] as well. They're all so much smaller than the polymer molecules that size isn't as important as you might think," (Wiles Tr. 1484), especially since "[t]here are lots of unoccupied sites of ester carbonyl groups in the polymer molecules of which the filaments are made [that are] not occupied by either glycerin or water in the Polysorb recipe." (Wiles Tr. 1453; *see also* Wiles Tr. 1394–95, 1449). The main force is the concentration gradient. (Wiles Tr. 1483, 1437–38).[6]

---

4. Glycerin is the trade name for glycerol and contains water and other impurities. Glycerin is hygroscopic and may be purchased in several different grades. (Longordo Tr. 255–57, 285–87; PX 27; Levy Tr. 190, 233; Wiles Tr. 1382–83, 1384, 1387–88).

5. "Migration of chemicals into a system is driven by a concentration gradient ...," (Wiles Tr. 1438), which depends upon the relative quantities of a chemical, such as glycerin, in and around a molecular structure, such as a suture filament. (Wiles Tr. 1438, 1454–55)

6. Dr. Wiles explained:

I spent more than 20 years studying the migration of molecules into polymeric systems where the polymers were organized in the semi-crystalline fashion I've mentioned. Almost by definition, nothing goes into the crystalline regions, but lots of things go into the amorphous regions; and I have personally measured the migration into and extraction from polymeric systems of molecules ... that are as small as water or ten times that size or 500 times that size or 1,000 times that size. And they go in and out *with time.* There is no question about it.

(Wiles Tr. 1394) (emphasis supplied).

30. The diffusion of the glycerin into the copolymer is a longer process than the capillary action of glycerin throughout the braided filament structure. (Kaplan Tr. 860) ("It doesn't happen ... instantaneously."); (Wiles Tr. 1394) (The migration of molecules into polymeric systems occurs "with time."); (Wiles Tr. 1439) (testifying that, "if you give the experiment long enough time to run," the same amount of glycerin will penetrate wood and sponge to the same degree).

31. In rebuttal, Cyanamid introduced the results of two sets of testing that were designed to show that no glycerin enters the polymeric portion of the suture, therefore concluding that glycerin does not act as a plasticizer. *See (infra* at 103).

In the first set of testing, films of polyglycolic acid were immersed in 99.5% glycerol for time periods of 20–25 minutes. No weight gain was observed upon removal of the PGA films from the glycerol bath, after blotting dry and weighing the sample. (Rivera Tr. 2019–38); (Jarrett Tr. 2047). U.S. Surgical, however, contends that these tests are irrelevant because: (i) Cyanamid introduced no evidence to establish any correlation between the behavior of a film and a suture filament and (ii) Cyanamid introduced no evidence that the glycerin was applied under conditions resembling those under which the glycerin is applied to Polysorb sutures. (Rivera Tr. 2038–44). Of course, testimony from Cyanamid on this issue would have been helpful, but these criticisms alone would not necessarily have been a basis to find the testing inconclusive. However, the Court has a more specific concern with the conclusion to be drawn from the testing, which is subsumed in U.S. Surgical's criticisms, but which is borne out by the record.

As stated *supra,* the diffusion of glycerin into the copolymer occurs with time, and there is no evidence to suggest that glycerin does not actually enter the copolymer in a time period longer than 20–25 minutes, or

that, if glycerin would enter the copolymer, it would have done so in the time period selected by Cyanamid. Consequently, this testing is inconclusive. At trial, tests on films and sutures, while taking into account the concerns of U.S. Surgical, over a variety of time periods may prove to be probative on this issue.[7]

In the second set of testing, Cyanamid used differential scanning calorimetry (DSC)[8] to determine the glass transition temperature of the copolymer in Polysorb. (Jarrett Tr. 2066). The glass transition temperature of a polymer is that temperature at which the amorphous region of the polymer makes the transition from a crystal material to a rubbery material. (Jarrett Tr. 2066); (Kaplan Tr. 829) ("[I]t's at the point where as you constantly increase the polymer's temperature, it rapidly changes properties, changes in its hardness, it changes in its heat capacity, it changes in a lot of different [ways]."). Some polymers will have a specific glass transition temperature, (Jarrett Tr. 2067); (Wiles Tr. 1464), and, if that same polymer has a plasticizer added to it, the glass transition temperature will be altered and, depending upon the system, commonly goes down. (Jarrett Tr. 2067); (Wiles Tr. 1473–74).

The glass transition temperature of untreated Polysorb sutures and Polysorb sutures treated with acetone or methylene chloride were determined, (Jarrett Tr. 2069–73), and Cyanamid found no difference in the temperatures, therefore contending that the glycerin does not penetrate the polymeric structure of the 90/10 copolymer in Polysorb. (Jarrett Tr. 2073–74).

Cyanamid's evidence may have been conclusive on this issue were it not for the testimony of Dr. Wiles, which was given earlier in the proceeding and before Cyanamid introduced its rebuttal evidence. Dr. Wiles testified that DSC is a difficult and technical

---

7. The testimony of U.S. Surgical's experts on the results and methods of this testing will also be helpful in reaching a final decision on this issue. An ultimate determination on this issue may also affect significantly the Court's presently unfavorable assessment of the validity of Cyanamid's testing.

8. DSC is a process wherein polymers are heated and thermal events that occur during the heating process are measured. (Jarrett Tr. 2066); (Kaplan Tr. 830–35).

procedure, especially when trying to determine the effect of a plasticizer in a polymer. He stated:

> [The glass transition temperature] is the measurement of the characteristics of the amorphous part of a semi-crystalline polymer. You get a transition from rigid, glassy-type material to a more fluidlike [sic] material. You can characterize semicrystalline polymers by measuring their glass transition temperatures. But that requires that the measuring device and the measuring method should not in fact alter the composition of the material that you are studying, and that can be a problem. Because if you measure by thermal characteristics, you raise the temperature, you can drive off some of the components in here, which means ... your sample is no longer the way it was when you started.

(Wiles Tr. 1463); *see also* (Wiles Tr. 1464).

Dr. Wiles continued by saying that in theory there is supposed to be a characteristic temperature for each polymer, but it can be difficult to measure and it is not always the same. (Wiles Tr. 1466).[9] As to Polysorb itself, Dr. Wiles testified:

> Once you have heated up a thing like Polysorb up to its melting point, you have driven off some of the plasticizers, some of the water is gone, some of the glycerin is gone. Now you are in trouble. You can't melt out the thermal history of that without in fact driving off the very plasticizer whose presence you're trying to find.

(Wiles Tr. 1468); *see also* (Wiles Tr. 1469–70).

Without taking into consideration the concerns of Dr. Wiles nor providing any rebuttal addressed to those concerns, the DSC testing is inconclusive. At trial, these and additional tests and testimony from the experts on the results and methodology may be probative.[10]

32. The amount of glycerin within the suture structure does not affect the amount of moisture available to the polymeric portion of Polysorb at a given relative humidity. (Tanquary Tr. 576, 594–95; Kaplan Tr. 864–65, 900–01;[11] Wiles Tr. 1395;[12] Schaefgen Tr. 1702–04).

33. At a given relative humidity, however, the amount of absorbed moisture in a suture, such as Dexon or Polysorb, is a function of the composition of the suture (e.g., polyglycolic acid) and the physical characteristics of its structure, including its surface-to-volume ratio. (Kaplan Tr. 903–04). Hence, "the larger the surface-to-volume ratio, the larger the amount of water for any given material." (Kaplan Tr. 903).

34. Without taking into account the differences in structure, components, filament size, and surface-to-volume ratios between Dexon and Polysorb, Table IV of the '622 patent does not provide the amount of absorbed moisture in Polysorb (or the polymeric portion of Polysorb) at a given relative humidity, including the as-packaged relative

---

9. "We get into a complex situation like this, and while in principle you can see the effects of a plasticizer ... in a polymer structure, in this thermal characterization method, I don't know whether you could see it in this system." (Wiles Tr. 1466–67); *see also* (Wiles Tr. 1474).

10. Cyanamid also contends that it is preposterous that glycerin diffuses into the polymer because Dr. Longordo demonstrated that "glycerin does not dissolve the polymer even after months of contact, *i.e.*, the two materials are totally incompatible." (Pl.'s Post–Hearing Principal Br. at 8 n. 8 (citing Longordo Tr. 316–19)). Dr. Wiles, however, testified unequivocally that the "[m]igration of a small molecule into a polymer has nothing whatever to do with the solubility of that polymer in these materials." (Wiles Tr. 1443).

11. Dr. Kaplan elaborated as follows:

> That's why I can't figure out why this whole thing works. There isn't enough glycerin on the surface, there isn't enough inside, there isn't enough anywhere to stop what the major problem is, which is the exposure of polymer to hydroxyl groups from water; and you have to remember that when you are talking about water, even though you are talking about a few tenths of a percent, you are talking about an infinite amount of water in the environment around it, and that is really the storage stability problem because you always have moisture in the atmosphere above the polymer ... that's always available to degrade the polymer.

(Kaplan Tr. 864–65); *see also* (Kaplan Tr. 791).

12. "There are far more sites in each filament where you could hydrogen bond glycerin or water or both ... than there is glycerin or water in the system." (Wiles Tr. 1395; *see also* Wiles Tr. 1449, 1453).

humidity. *Compare* (Tanquary Tr. 574–76) *with* (Kaplan Tr. 902–04; Schaefgen Tr. 1706; PX 1, at cols. 17–18).[13]

35. The Polysorb suture is attached to a needle and rests in a grooved tray. (Kaplan Tr. 867–70; PX 26).

36. A glycerol/water cellulose pad is included in the Polysorb package. (Kaplan Tr. 813–15, 866–70). The pad is placed in the package to keep the glycerin level on the suture constant by filling the areas within the package that have no glycerin and thereby establishing an equilibrium of glycerin in the enclosed atmosphere. (Kaplan Tr. 814, 870–76, 881, 915–16 ("[T]he purpose of the pad is to fill all the spaces on all the surfaces, but not the suture.")).[14]

37. In developing U.S. Surgical's synthetic absorbable suture, Dr. Kaplan sought to produce a suture that would be smoother and easier to handle in comparison to existing synthetic absorbable sutures. (Kaplan Tr. 759, 842). The handling characteristics of silk were used as a standard. (Kaplan Tr. 759–60, 842). With these goals in mind, he decided to use a unique braid structure (Kaplan Tr. 750–51, 757–59; Wiles Tr. 1459) and glycerin as a plasticizer[15] (Kaplan Tr. 759–60; Wiles Tr. 1415, 1459) without reference to the Glick '622 patent. (Kaplan Tr. 779).

38. Dr. Kaplan decided to use glycerin as a plasticizer because it had been used with other medical products and was edible, non-reactive with tissue, and emollient. (Kaplan Tr. 760).

39. Although glycerin is not a polymer, does not significantly enhance the tensile strength of the suture, and does not directly participate in the wound closure process, (Kaplan Tr. 817), its function as a plasticizer affects the flexibility of the suture. Polysorb's promoted reduction in tissue drag,

however, results from the terpolymer coating, not the glycerin. (Kaplan Tr. 839–41).

40. The glycerin, for unknown reasons, (Kaplan Tr. 791, 864–65; Schaefgen Tr. 1698–70 (hypothesis)), allows Polysorb to be packaged above the .25% maximum moisture level contained in the '622 patent without causing the suture to degrade prematurely. (Kaplan Tr. 759–60, 778–79; Wiles Tr. 1397–1401).

41. In addition to promoting Polysorb's reduced tissue drag (Kaplan Tr. 768) and improved handling characteristics, U.S. Surgical promotes improvements in the needle quality and packaging of its suture products. (Kaplan Tr. 747–50, 759–60, 776–77; Knarr Tr. 1766).

42. Two United States patents have issued to U.S. Surgical for Polysorb: one for the claimed improvement in storage stability achieved by the glycerin composition and the other for the braid structure. (Kaplan Tr. 792; DX V; DX W).

## II. VALIDITY

### A. Obviousness–Type Double Patenting

43. U.S. Surgical asserts that the '622 patent is invalid for obviousness-type double patenting and is therefore an unlawful extension of the now expired U.S. Patent No. 3,626,948 (the " '948 patent"). The '948 patent issued on December 14, 1971 and expired on December 14, 1988. Cyanamid owns both the '622 and the '948 patents, and Arthur Glick is an inventor of both patents. (PX 1; PX 67).

■ 44. In assessing an obviousness-type double patenting defense, the principal factual determination is whether, to one of ordinary skill in the art,[16] Claim 1 of the '622

13. The relative humidity within the Polysorb package is between 10–15% (Kaplan Tr. 879–80) (confidential); *see also* (Kaplan Tr. 880, 884–85).

14. Without citation to expert testimony, Cyanamid unsuccessfully argued that this testimony was incredible. (Pl.'s Post–Hearing Reply Br. at 17–19 (citing PX 27)).

15. A plasticizer is "usually a nonpolymeric chemical that's added to a polymeric material to impart flexibility [and] softness, [and] to reduce

the stiffness ... of a polymer." (Wiles Tr. 1412); (Tanquary Tr. 670) ("A plasticizer is a substance that softens another polymer.").

16. Neither party proposed or argued about the level of ordinary skill in the art at the time of the claimed invention. One skilled in this art would, however, have either (i) a postgraduate degree in chemistry and working knowledge of the characterization, evaluation, or manufacture of polymers or (ii) an undergraduate degree in chemistry with significant work experience in the char-

patent was an obvious modification of the claimed invention of the '948 patent in light of the prior art. (Adelman Tr. 950–51; Chisum Tr. 1864–65).[17]

45. The expired '948 patent claims synthetic absorbable polyglycolic acid surgical prostheses, including sutures, that have enhanced *in vivo* strength retention. Claim 1 of the '948 patent reads as follows:

An absorbable surgical prosthesis which is compatible in living tissue comprising a filamentary strand structure of synthetic tissue absorbable material for use as a suture or ligature, said absorbable material consisting of polyglycolic acid, substantially free of vaporizable impurities, having substantially enhanced in vivo strength retention characteristics and being further characterized by a weight loss of less than 0.4 percent by weight when said polyglycolic acid is heated for 3 hours at 135 [degrees] C. under a pressure of 4 mm. of mercury.

(PX 67, cols. 11–12).

46. Claim 1 of the '948 patent requires the polyglycolic acid suture to be "substantially free of vaporizable impurities," which include water. (PX 67, col. 2, 1.58–col. 3, 1.5; Tanquary Tr. 634, 638; Chisum Tr. 1866).

47. The heating and pressure conditions described in the '948 patent for removing vaporizable impurities, (PX 67, col. 12, 11.23–25), result in a suture that has a moisture content by weight of less than .1% (Kaplan Tr. 786–87, 789 (.03%–.05% range); Wiles Tr. 1427 ("bone dry")). The moisture content of

the suture claimed in the '948 patent is therefore within the '622 patent's claim of "at or less than .25%" (PX 1, col. 21, 11.25–27).[18]

48. Dr. Tanquary acknowledged that the '948 patent describes "pretty rigorous conditions" for removing vaporizable impurities that will result in a polyglycolic acid suture having improved stability. (Tanquary Tr. 634, 638–39). Obtaining improved stability of a polyglycolic acid suture was also the goal of the '622 patent. (PX 1, col. 3, 11.33–48).

49. The polyglycolic acid polymer in the '948 and '622 patents is the same. (Chisum Tr. 1868).

50. The polyglycolic acid suture in the claims of the '948 and '622 patents are both stable primarily because of the absence of, *inter alia*, moisture. (Tanquary Tr. 634, 638–39; Wiles Tr. 1377–78; PX 1; PX 67).[19]

51. Hence, the only element of the '622 patent claim not also contained in the language of the '948 patent claim is the moisture impervious package. (Kaplan Tr. 906–07; Chisum Tr. 1868, 1870).

52. Moisture impervious packages were known to persons skilled in the art before the '622 patent application was filed. Drs. Tanquary and Wiles both worked with moisture impervious aluminum foil packages in the 1950's and 1960's. (Tanquary Tr. 658–60; Wiles Tr. 1427–31). The '622 prosecution history reveals, moreover, that the moisture impervious packaging used and described by

---

acterization, evaluation, or manufacture of polymers.

17. The parties neither proposed nor argued about evidence pertaining to the so-called secondary considerations, i.e., objective evidence of obviousness or nonobviousness.

18. Although Dr. Tanquary based his opinion of nonobviousness upon the explicit numerical limitation of .25% in the '622 patent, (Tanquary Tr. 643) ("The emphasis here really is that the water content in the surgical element, the suture, polyglycolic acid fiber, has to be at or less than 0.25 percent, and that was obviously not known before."), the '948 patent teaches a polyglycolic acid suture that has a moisture content within the claimed limitation of the '622 patent. Findings of Fact ¶ 47; (Chisum Tr. 1868–70); *see* (Chisum Tr. 1869) ("All of the technical testimo-

ny that I heard indicated that [the '948 suture,] simply because of what that phrase means in the 948 patent when it talks about being substantially free of vaporizable impurities, ... would be much dryer, inevitably as dry or much dryer as specified in [the '622] limitation.").

19. [W]ater is the critical element here, more important than anything else. It's water that hydrolyzes the ester linkages in polyglycolic acid. It is not how they react to the monomer; *it is not the dimer you get from any polymerization process or any degradation process.* It is water. The problem with those other impurities that are vaporizable is [that] they will attract more water per unit weight than the polymer will. That makes it worse. That is why you want to get the water and other impurities off. (Wiles Tr. 1508–09).

Glick was known in the art. (Adelman Tr. 974–76; Chisum Tr. 1871; DX E (Brief on Appeal at 9); Pl.'s Post–Hearing Reply Br. at 2 n. 1). *Compare* (DX DJ, at 5) ("[T]he finding of a container impervious to water vapor was an engineering problem as recognized by the examiner.") *with* (DX DJ, at 5) ("The package itself as here claimed is also novel.").

53. Since moisture impervious packaging was known in the art and since the '948 patent taught that removing (and preventing the recondensation of) substantially all of the moisture improved the stability of the polyglycolic acid suture, it would have been prima facie obvious to a person of ordinary skill in the art to package the desiccated polyglycolic acid suture claimed by the '948 patent in the known moisture impervious package in order to maintain its stability. (Kaplan Tr. 908–09, 922–23; Wiles Tr. 1428, 1502–03,[20] 1507–10; Chisum Tr. 1869–72, 1875–77, 1934–35, 1937–38; PX 67, col. 3, 11.47–55). *But see* (Tanquary Tr. 643; Adelman Tr. 954–55). Otherwise, it would have made no sense to treat the polyglycolic acid suture in accordance with the '948 patent and remove the moisture in the first place. (Wiles Tr. 1428); *see also* (Adelman Tr. 976–78). Hence, the '948 patent suggests to one skilled in the art that, in order to use (or even measure) the benefits of the invention, the suture claimed should be kept in a moisture free environment, i.e., moisture impervious packaging.

■ 54. Cyanamid argues that, since the '948 patent was cited in the specification of the '622 patent, the Patent Office considered and rejected the obviousness-type double patenting issue. However, the '948 patent was simply listed among six other patents in the specification, (PX 1, col. 2, 11.49–

52; Chisum Tr. 1883–84), with no statement in the patent or the prosecution history that would have referred the Examiner to the '948 patent's disclosure of a "bone-dry" polyglycolic acid suture, which, based upon the evidence, would have a moisture content at or below .25% (Chisum Tr. 1884) ("There is no reference there or highlighting of 948 as disclosing the dryness factor or removing impurities, including water, which is quite different than the general disclosures that most of these patents have about glycolic acid sutures and surgical elements."). In addition, the '948 patent was not identified on the face of the '622 patent under the "references cited" and was not therefore formally cited or "of record"[21] in the '622 patent proceedings. (Chisum Tr. 1881–83).

55. There is also no evidence to suggest that the Examiner actually considered the double patenting issue as it related to the '948 patent or otherwise became aware that the '948 patent claim contained the teaching that a suture processed under its conditions would fall within the '622 patent's limitation of at or less than .25% moisture and thereby improve the suture's stability. (Chisum Tr. 1881–82). This information would have been important to the Examiner because the .25% limitation formed a principal basis for allowing the claims of the '622 patent. (Adelman Tr. 942; Chisum Tr. 1872–77, 1883–85; DX DL).

56. Cyanamid's response to U.S. Surgical's showing of obviousness-type double patenting consists of an allegation that the '948 patent specification is inconsistent with the claims of the '622 patent. (Tanquary Tr. 634–37; Kaplan Tr. 907–08; Adelman Tr. 955; PX 1, col. 6, 11.38–48; PX 67, col. 8, 11.12–15).[22] According to Cyanamid, the '948

---

**20.** [I]f you do to the polymer what that paragraph tells you to do to get rid of these impurities, one of them would be water, and the water would re-condense from the atmosphere when you went back to atmospheric pressure, the fact that [the water] isn't going to be a white powder is neither here nor there. One skilled in handling polymers would know that water is one of the impurities …
(Wiles Tr. 1502). *But see* (Pl.'s Post–Hearing Principal Br. at 28–29).

**21.** " '[O]f record' means it's a prior patent or publication or other item of prior art that the

examiner has cited and incorporated in these official actions, and thereafter it's then incorporated right into the patent and listed on the cover sheet under a part called 'References Cited'." (Chisum Tr. 1881).

**22.** In ordinary cases, this evidence may be considered as a secondary consideration presenting objective proof of nonobviousness. *Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 991 (Fed.Cir.1988) ("The court also considered evidence that at the time of the invention the art taught away from the invention."). For the rea-

patent specification suggests, through a reference to U.S. Patent No. 3,297,033 (the "Schmitt '033 patent"), the use of a moisture pervious package with its treated polyglycolic sutures. (PX 67, col. 8, 11.12–15; PX 72). Cyanamid's reliance on this passage of the '948 patent specification is unfounded.

57. First, the double patenting inquiry centers only upon the claims of the '948 patent, (Chisum Tr. 1864–65; Adelman Tr. 951), and the claims of the '948 patent do not refer to packaging. (Kaplan Tr. 906; Chisum Tr. 1926; PX 67). Although the specification may be considered to the extent necessary to interpret the claims, (Chisum Tr. 1864), Cyanamid has not provided a reason for considering the specification on this issue.

58. Second, the moisture pervious packaging referred to in the passage of the specification relied upon by Cyanamid is inconsistent with the teaching of the '948 patent that vaporizable impurities such as water, once removed, must be kept away from the suture and its surrounding environment. *Compare* (Kaplan Tr. 909; PX 67, col. 3, 11.47–70) *with* (Tanquary Tr. 638–39). A person skilled in the art would have understood this teaching to require moisture impervious packaging in order to prevent the removed moisture from redepositing itself on the suture and in order to maintain the stability of the desiccated suture. (Wiles Tr. 1428; Kaplan Tr. 909, 922–23).

59. Third, Cyanamid's contention is inconsistent with Glick's contemporaneous knowledge that a moisture impervious package was required. Glick knew at least as early as October 25, 1968 (two months before the '948 patent application was filed on December 23, 1968) that a moisture impervious package was required in order to maintain the stability of the "bone-dry" suture of the '948 patent claims. (DX AY). Moreover, the '622 patent's disclosure of the inappropriateness of moisture pervious packaging, (Tanquary Tr. 636–37, 641; PX 1, col. 6,

11.38–48 & col. 9, 11.1–4), the application for which was filed ten days after the '948 patent application, (PX 1 (Jan. 2, 1969); Chisum Tr. 1878), and based upon an invention disclosure dated over two months earlier, evidences Glick's knowledge at the time the '948 patent application was filed that a moisture impervious package was necessary to maintain the stability of suture taught in the '948 patent. Hence, in these circumstances, Glick's reference in the '948 patent "away" from the '622 patent cannot later become an objective consideration of nonobviousness in the '622 patent litigation.[23]

60. Glick's failure to disclose the necessity of moisture impervious packaging in the '948 patent application raises the following questions: (i) whether he disclosed the best mode for practicing the invention, (Chisum Tr. 1932–33; 2001–03), (ii) whether, in light of his record of invention, he disclosed accurate information (i.e., the reference to packaging in accordance with the '033 patent) to the Patent Office during the prosecution of the '948 patent, and (iii) whether Glick therefore intended to extend the patent grant beyond the expiration of the '948 patent. (Chisum Tr. 2001–03; DX AY).

61. Cyanamid's arguments are insufficient to rebut U.S. Surgical's prima facie case that the Claim 1 of the '622 patent is an obvious modification of Claim 1 of the '948 patent.

### B. Prior Public Use

■ 62. U.S. Surgical's second invalidity defense is based upon its contention that Cyanamid's polyglycolic acid sutures packaged in accordance with the '622 patent were in public use more than one year before the effective filing date of the '622 patent.

63. The effective filing date of the '622 patent is the date of the first application in the series of applications that contains all of the elements of the '622 patent claim. (Chi-

---

sons stated above, this Court rejected that argument in the circumstances of this case, and the evidence was not considered as a secondary consideration of nonobviousness.

**23.** *Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 991 (Fed.Cir.1988) (While "[t]hose skilled in

the art were looking to higher mass and denser materials to block sound[,] Mr. Gardner went in a direction different from that of *others in the art*, and his invention thus produced unexpected results." (emphasis supplied)).

sum Tr. 1885–89, 1890–94, 1997–98; Adelman Tr. 943–45).

64. The first '622 patent application (S.N. 788,501), which was filed on January 2, 1969, does not literally disclose any numerical moisture limitations, including the .25% limitation of the '622 patent claim. (Adelman Tr. 943; Chisum Tr. 1887–88, 1891; DX D). The .25% limitation first appeared in the second '622 patent application (S.N. 138,425), which was filed on April 29, 1971. (Chisum Tr. 1887–88; Adelman Tr. 943–45; Tanquary Tr. 2116–17; DX C, at 29, Table IV).

65. After filing the second application, Glick admitted[24] that claims containing the .25% limitation were entitled only to the April 29, 1971 filing date. (Chisum Tr. 1890–94, 1942–45; DX FV, at 5). In the same disclosure, Glick stated that claims containing much lower moisture limitations—below .05%—were inherently disclosed and supported by the preferred embodiment of the first '622 patent application. (Chisum Tr. 1945–48, 1893, 1950–51). Glick therefore concluded that he could not find inherent support for the .25% limitation in the first application. (Chisum Tr. 1941–47; DX FV, at 5–6). *But see* (Adelman Tr. 983–84).

66. Although the first '622 patent application does not literally disclose or support ·the .25% limitation, (Adelman Tr. 948; Tanquary Tr. 2116; Chisum Tr. 1887–88, 1891), Cyanamid, in response to the prima facie evidence of the effective filing date, contends that the .25% limitation is inherently disclosed in the first '622 patent application.[25]

67. As a person skilled in the art, Dr. Tanquary testified in rebuttal that, from the disclosure in the first '622 patent application of sutures packaged at 20–30% relative humidity, (Tanquary Tr. 2108–12), he would have been able to determine the moisture content "break point" of .25% that would provide a useful suture. In order to make

this ultimate determination, however, Dr. Tanquary testified that he would have had to perform experiments with moisture analyzers to take the measurements. (Tanquary Tr. 2114–19; Adelman Tr. 946–47, 983). Based upon his testimony, however, there is no evidence to suggest that Dr. Tanquary would have considered those experiments if he did not have the second '622 patent application to guide him. Dr. Tanquary·testified that the sutures in the first application packaged in the 20–30% relative humidity range were on the "ragged edge" of usefulness and that he could not be certain from the first application's disclosure that any suture in this range would be useful after storage. (Tanquary Tr. 2114–16 ("And I really don't know.") ("Maybe as you get down toward 20 percent it's going to be okay.")). Hence, the first application's disclosure would not have necessarily or inevitably led a person skilled in the art to the critical .25% limitation or to further inquiry or experiments into the usefulness of sutures in the 20–30% relative humidity range, which includes those having a moisture content of .25% by weight.

68. Dr. Tanquary's testimony does not establish that the first '622 patent application would necessarily or inevitably[26] lead one skilled in the art to identify inherently the critical .25% limitation within the first application, which was first disclosed in the second, April 29, 1971 application. His *ability,* as one skilled in the art, to run a series of experiments to derive the critical limitation is insufficient to show that the limitation is *described* in the first application as a part of the invention later claimed.

69. Dr. Tanquary's opinion also contradicts the earlier admission made by Glick that the .25% limitation was entitled only to the April 29, 1971 filing date of the second application. (DX·FV, at 5).

---

24. An admission I use only in the sense of a clear recognition on their part that it is against their interest, a recognition that certain claims with certain limitations in them are entitled to the filing date of the second application, which is less desirable, of course, than it should be entitled to in the first application. (Chisum Tr. 1942).

25. Inherence is a "question whether a person of ordinary skill in the art reading the parent application would find that it conveyed to him or her that that disclosed the invention, including all of the limitations and parameters." (Chisum Tr. 1948; Adelman Tr. 948–49).

26. *See* (Chisum Tr. 1945–46).

70. The '622 patent is entitled only to the filing date of the second '622 patent application, April 29, 1971.

71. Because the effective filing date of the '622 patent is April 29, 1971, this Court considered evidence of public use prior to April 29, 1970. (Chisum Tr. 1885–89).

72. Numerous publications demonstrate that Cyanamid's polyglycolic acid sutures were used in many surgical operations prior to April 29, 1970. (Chisum Tr. 1898–1904; DX CA; DX CB; DX CC; DX CD; DX CE; DX CF; DX CG).

73. The principal determination is therefore whether the polyglycolic acid sutures described in the publications were packaged in accordance with the '622 patent. The publications describe surgical procedures that commenced at least as early as 1968 in which Cyanamid's polyglycolic acid sutures, stored in dry packages, were used. (Chisum Tr. 1895–97; DX BA; DX CC). *But see* (Adelman Tr. 956–57). [[ ]] (Chisum Tr. 1894–95; DX AY). Finally, the invention disclosure states the "package is tentatively that which will be used to market the polyglycolic acid suture," (DX AY), which strongly suggests that the sutures used in the surgical procedures described in the publications were packaged in accordance with the '622 patent. Hence, the dry packages used in the clinical trials described in the publications were undoubtedly moisture impervious, rather than those packages that were termed "dry" but only "free from visible moisture." (Adelman Tr. 1015–16; DX DJ, at 3).

74. Cyanamid does not dispute the accuracy of the publications or that the sutures used in the surgical procedures were packaged in accordance with the '622 patent. Rather, Cyanamid contends that any use of the '622 patent package prior to April 29, 1970 was experimental, non-commercial, and investigatory. Cyanamid therefore contends that this experimentation (for the purpose of determining whether the sutures, however supplied, would work for their intended purposes (Adelman Tr. 959–60)) cannot constitute public use. The evidence, however, shows that the surgical procedures prior to April 29, 1970 were not experimental because: (i) [[ ]] (ii) the information collected during the surgical procedures did not relate to the invention, i.e., the suture package or storage stability; (iii) there is no evidence that Glick was involved in, had control over, or obtained feedback from the surgical procedures; and (iv) there is no evidence that the participants in the surgical procedures were placed under any limitation or obligation of confidentiality. Indeed, the results of the surgical procedures were published widely. (Chisum Tr. 1894–98, 1903–04; DX AY; DX BA; DX CA; DX CB; DX CD; DX CE; DX CF; DX CG). The breadth and scope of these publications, moreover, strongly suggests that the surgical procedures were designed commercially to promote the product in the surgical community. (Adelman Tr. 961, 994–95, 997–98).

75. The Court finds that U.S. Surgical has established a prima facie case that the package claimed in the '622 patent was in public use prior to April 29, 1970. (Chisum Tr. 1903–04). Because any other evidence that relates to these surgical procedures and publications is within Cyanamid's control, (Chisum Tr. 1904–05; Adelman Tr. 992), and because Cyanamid has not rebutted U.S. Surgical's prima facie case of public use or supported its contention that the surgical procedures were experimental, the Court finds that any additional evidence under Cyanamid's control would, at this stage in the proceeding, likely bolster U.S. Surgical's defense.

## III. INFRINGEMENT

### A. Claim 1 of the '622 Patent

76. Claim 1 of the '622 patent reads as follows:

A package comprising an air-tight sealed container fabricated from a material which is substantially impervious to water vapor, said container having therein a storage stable sterile synthetic surgical element of a polymer subject to hydrolytic degradation to non-toxic, tissue-compatible absorbable components, said polymer having glycolic acid ester linkages, said storage stable sterile synthetic surgical element further characterized in that the absorbed

water moisture in the sterile surgical element is at or less than 0.25% by weight of the sterile surgical element, in the sterile enclosure.

(PX 1, col. 21, 11.15–27; DX DP).

77. A suture is one of the surgical elements covered by the '622 patent. (Tanquary Tr. 654; Chisum Tr. 1954–55; PX 1, col. 21, 11.28–30; col. 5).

78. The "surgical element" described in the '622 patent means the entire suture (in this case Polysorb), and this Court therefore interprets Claim 1 to mean that all of the moisture in the Polysorb suture is considered in determining infringement, not just moisture in the polymeric portion of the suture. *Compare* (Tanquary Tr. 548–49, 554–60, 655–57; Adelman Tr. 938–41, 969–71, 1000–02) *with* (Wiles Tr. 1422–25; Chisum Tr. 1908–11, 1979–80).

79. As so interpreted, Polysorb contains every element of Claim 1 of the '622 patent except the moisture limitation of "at or less than 0.25% by weight of the sterile surgical element." (Levy Tr. 186–88; Geoffroy Tr. 1327–29; PX 19; PX 29; DX Z; DX EB).

80. This Court's interpretation of Claim 1 is based upon the language and structure of the claim, by the specification of the '622 patent, by other patents cited in the '622 patent, by the prosecution history of the '622 patent, by the testimony of persons skilled in the art, and by Cyanamid's conduct.

81. Claim 1 relates to a package containing a "surgical element of a polymer." Cyanamid interprets this phrase to mean that the term "surgical element" as used elsewhere in the claim refers only to the polymer. (Tanquary Tr. 558–60). The claim, however, does not suggest that the phrase restricts the content of the surgical element to the polymer, which, although primary, is only one component of a surgical element. (Wiles Tr. 1422–25; Chisum Tr.

1908–11 ("There certainly wasn't any dictated conclusion that the only thing you consider is the polymer in the surgical element or that the surgical element of a polymer has only the polymer in it and nothing else."); PX 1, col. 21, 11.14–27). Professor Adelman based his interpretation of Claim 1 in large part upon the "incongruity" of U.S. Surgical's interpretation of the claim. (Adelman Tr. 969–71). He was concerned that other "non-infringing" embodiments of Claim 1 would infringe under U.S. Surgical's interpretation if, for example, a "heavy coating" or "stainless steel network" brought the total weight of the "surgical element" to a level where the "non-infringing water content" suddenly became at or less than 0.25% by weight. On the present record, however, the Court rejects this argument and instead focuses on the traditional tools of claim construction, discussed above and below, in part because "it's always possible to think up some strange embodiment that might fall within a patent claim but not be operable." (Chisum Tr. 1969); *see also* (Chisum Tr. 1979–80) (The claim discloses a practical, clear "measuring stick," and "[m]aybe it doesn't work perfectly for all types of surgical elements, but we have to have a practical measuring stick in a patent claim.").[27]

82. The language in the claim differentiates the surgical element and the polymer. (Chisum Tr. 1908–10). Although the claim characterizes the polymer apart from the surgical element ("a polymer subject to hydrolytic degradation" and "said polymer having glycolic acid ester linkages"), it defines the moisture limitation in terms of the surgical element rather than the polymer. (PX 1, col. 21, 11.14–27). Hence, the polymer and the surgical element have different meanings. *But see* (Tanquary Tr. 682) ("I look at [the polymer and the surgical element in Claim 1] as being identical, just describing them in different ways.").

---

27. As a general proposition, claims should be construed in a rational and practical manner, and their interpretation should lead to neither absurd nor unjust results. This portion of Professor Adelman's testimony, however, not only appears to run counter to the settled methodology of construing claims, *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1118 (Fed.Cir.

1985) ("It is only *after* the claims have been *construed without reference to the accused device* that the claims, as so construed, are applied to the accused device to determine infringement." (emphasis in original) (citation omitted)), but also bases the construction of Claim 1 in large part upon hypothetical accused devices, which may or may not be operable.

83. The '622 patent specification states that the surgical element may contain components in addition to the polymer and therefore contemplates the measurement and consideration of the moisture content of all of the components of the suture. The specification nowhere states or suggests that, in order to fall within Claim 1, the surgical element or suture must be made only from a polymer or that the moisture content of other components of the surgical element should not be considered.

84. The '622 patent specification states that the "polyglycolic acid suture itself may be in any form whatsoever such as a multifilament braid or monofilament. It may further be needled, dyed, coated, or otherwise treated in accordance with standard suture techniques." (PX 1, col. 10, 11.45–49); (Chisum Tr. 1914). In addition, the '622 patent specification states that the polymer may be combined with "other Components." (PX 1, col. 5, 1.35).

85. The '622 patent states that surgical elements may contain absorbable and nonabsorbable components, such as those described in U.S. Patent No. 3,463,158. (PX 1, col. 15, 11.48–59).

86. The moisture tests described in the '622 patent can determine only the moisture content of the entire suture, and the '622 patent does not teach a test for measuring the separate moisture content of the components of the suture. (Levy Tr. 216–17; Longordo Tr. 249, 474–80; Tanquary Tr. 696–97; Chisum Tr. 1913; Geoffroy Tr. 1310–13, 1321, 1331; Kaplan Tr. 921; DX DS (Excerpts Re: Moisture Test Procedures From U.S. Patent 4,135,622 (quoting col. 16, 11.29–34, 38–53)).

87. The '622 patent teaches that it is "essential" to maintain the sutures in a desiccated state and contains admonitions that water cannot be permitted to contact the polymer or even to be present in the package environment. (Schaefgen Tr. 1517–20; PX 1, col. 3, 11.34–41; col. 6, 11.21–31, 11.49–64; col. 13, 1.64–col. 14, 1.20; col. 18, 11.50–53; col. 20, 11.47–49). Since, to the inventor, it was necessary to remove all moisture within the suture and in the environment to achieve the desired results, the claim limitation of .25% applies to all of the moisture in the suture. (Chisum Tr. 1983–84).

88. The '622 patent incorporates by reference the Schmitt '033 patent, which describes surgical elements that include plasticizers, coatings, and dyes. (PX 1, col. 1, 11.22–24; PX 72, col. 3, 11.42–52). Hence, the '622 patent's surgical element could contain nonpolymeric components.[28]

89. The '622 patent specification, which contemplates that plasticizers may form one of the components of the surgical element, is significant because the glycerin in Polysorb functions as a plasticizer and diffuses into the polymer. (Kaplan Tr. 759–60, 810–11, 860, 863–65; Wiles Tr. 1384, 1391, 1393–94, 1437, 1455–60, 1475; Tanquary Tr. 582–83, 598–99 (glycerin is negligible)).[29] In a series of hypothetical questions, Professor Adelman acknowledged that any plasticizing component within (i.e., bonded to) the polymer is considered part of the surgical element for

---

28. Cyanamid contends that U.S. Surgical's reliance on the '033 patent is contrived because (i) that passage of the '033 patent suggests to one skilled in the art that a plasticizer should not be added because it would degrade, not enhance, important physical properties of the fiber, such as crystallinity, orientation, and strength and (ii) "if a plasticizer were to be included in the polymer structure, it would be added *during* polymerization, not added as a coating to the fully formed polymer braid." (Pl.'s Post–Hearing Principal Br. at 25–26) (emphasis in original). This Court does not agree on the present record because (i) Cyanamid presented no expert testimony on these issues, (ii) the '033 patent only states that, "*[i]n general*, plasticizers tend to interfere with crystallinity . . .," (PX 72, col. 3, 11.44–52) (emphasis supplied), and (iii) Cyanamid presented no expert testimony that plasticizers may only be added during polymerization. Indeed, in *Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 985–87 (Fed.Cir.1988), the Federal Circuit engaged in an extensive discussion of plasticizers and found, on the basis of that record, that plasticizers may be added (i) to the reaction mixture before polymerization, (ii) simultaneously with the polymer in the same reaction mixture, or (iii) to the polymer after it has been formed. *Id.* at 986–87. At trial, expert testimony will be required on these issues.

29. Negligible "means the percentage is so small that it does not alter the end result to any substantial degree." (Tanquary Tr. 712).

the purpose of determining moisture content. (Adelman Tr. 1013–14).

90. The '622 patent specification is consistent with U.S. Surgical's interpretation of the claim.

91. During the prosecution history of the '622 patent, the pending claims characterized the moisture content in terms of the polyglycolic acid. These claims were later amended to characterize the moisture content in terms of the surgical element instead of the polyglycolic acid, which shows that Glick both appreciated the difference and chose different language depending upon the meaning he intended to convey. (Chisum Tr. 1915–16 [30], 1951–54; DX DE, at 33; DX DG, at 41; DX DI, at 2); see also (Tanquary Tr. 691–94, 715–19).[31]

92. As in the patent specification, the prosecution history contains several teachings that mandate the complete removal of moisture not only from the suture but also from its as packaged environment. (Chisum Tr. 1916–19). For instance, Dr. McPherson submitted a critical affidavit that reads in part as follows:

> To secure the advantages of the present invention, three things must be achieved. One must vigorously remove absorbed moisture vapor from the suture material and container interior. One must maintain the container interior and its contents in this desiccated state before sealing the container. Finally, one must hermetically seal the moisture vapor impermeable container.
>
> I cannot over stress that all of the above three conditions must be met and, for example, it is not enough just to remove absorbed moisture vapor from the suture but not take care to preserve the desiccat-

ed state prior to sealing the suture in the moisture vapor impermeable container.... (DX DK, at 8).

93. Cyanamid's current interpretation of the claim, which allows significant amounts of moisture in the suture package and in the suture itself, contradicts the prosecution history of the '622 patent. (Schaefgen Tr. 1520). Dr. Tanquary concurred in part when he said that glycerin containing water as a component of a synthetic absorbable suture could not have been contemplated by Glick at the time of the '622 patent proceedings. (Tanquary Tr. 706–10).

94. The testimony of persons skilled in the art of polymer science, suture technology, and testing technology supports this Court's interpretation of the claim.

95. Dr. Wiles testified that glycerin is part of the suture and that a surgical element is the entire suture product as it comes out of the package, including the glycerin. (Wiles Tr. 1422–25).

96. Dr. Kaplan testified that glycerin is part of the suture and that the surgical element is the entire suture. (Kaplan Tr. 810–11, 860, 863–65, 920 ("[W]e have done the exact opposite of what Glick said, which is to add water to make something soft, rather than take it away.")). As such, Dr. Kaplan never tested (nor considered testing) the individual components of Polysorb under the '622 patent. (Kaplan Tr. 779–80).

97. Dr. Tanquary testified that, in general, a suture is a surgical element in common everyday terms, but that, as one skilled in the art of polyglycolic acid sutures, the surgical element is the polymer. (Tanquary Tr. 654–57, 688–90, 701–02, 721–22, 650–713); see (Tanquary Tr. 688) ("At the time [the claim] was written, I'm sure that that's what was meant at that point [because w]e were refer-

---

**30.** Professor Chisum explained:

Now, it's true, I've heard references to the fact that those claims measured something else that were structured differently, and that's true they were measuring the water inside the envelope to the polymer material as opposed to the water in the suture versus the suture, but it shows the kind of awareness, that we can talk about the suture or we can talk about the polymer of which it is made, and we know the difference. It's not one of those cases where

everybody assumed all the way through that "suture" and "polymer" were the same. There's clear evidence that they knew how to say it one way or say it the other way....

**31.** A complete reading of the May 8, 1975 amendment and supporting affidavits, (PX 3), portions of which are relied upon by Cyanamid, (Pl.'s Post–Hearing Reply Br. at 11–13), does not alter the Court's findings.

ring to the polyhydroxacetic ester suture which is the only thing in there."). Dr. Tanquary also contended that, if "surgical element" means the entire suture or the "thing that comes out of the package," the Court should include not only the coating but also the needle. He contended correctly that including the needle would make no sense because it would skew the moisture content downward unnecessarily. (Tanquary Tr. 684–88). However, under this Court's interpretation of the claim, coupling the incongruity of measuring the needle with measuring the other components of Polysorb is not persuasive. Everyone agrees that the needle should not be included, (Wiles Tr. 1423, 1494–95) ("The needle is a common factor in a surgical device like a suture regardless of what's fastened on the end of it."); (Chisum Tr. 1913, 1963–64), but this does not mean that additional components within the suture, which are expressly contemplated by the '622 patent, should also not be included.

98. The '622 patent neither describes (nor provides a reason for) a test that could determine the moisture content of the individual suture components. Moreover, the testimony adduced at the hearing concluded that no test or technique had ever been published, known to persons skilled in the art, or even attempted before Drs. Levy and Longordo to determine the moisture content of the individual components of a suture. (Levy Tr. 216–18; Longordo Tr. 249, 475; Tanquary Tr. 696–97; Kaplan Tr. 779–81, 915; Geoffroy Tr. 1331; Schaefgen Tr. 1522–23, 1526–27).

99. Prior to and during this action, Cyanamid tested sutures in accordance with the '622 patent and therefore considered all of the moisture in the suture for the purpose of determining infringement under Claim 1.

100. Upon receipt of Polysorb samples, Cyanamid tested the entire suture in accordance with the '622 patent, (Longordo Tr. 247, 250–51, 356–57, 362–72, 375, 474), and compiled an average total moisture content of .69%, (Levy Tr. 187–88), which is both consistent with U.S. Surgical's moisture testing and above the .25% limitation in Claim 1. (Geoffroy Tr. 1327–31; DX EB). With knowledge that Polysorb contained glycerin,

(Longordo Tr. 246–53; DX Z), Cyanamid tested the total moisture content of the Polysorb suture for almost two months, (Longordo Tr. 246–53; DX Z), and even used the same testing laboratory that U.S. Surgical used for its testing of Polysorb. (Longordo Tr. 363–68; Geoffroy Tr. 1329–31; DX AC).

101. Cyanamid tested the entire Polysorb suture because its protocol and the patent itself called for that method. (DX AJ) (confidential); (PX 1, col. 16, 11.29–34, 42–53). Every moisture test conducted by Cyanamid or any of its experts over the past twenty years has determined the total moisture content of the suture, including Cyanamid's testing of competitive coated sutures for infringement under the '622 patent. (DX AK; DX AM; DX AN; DX AP, at 1–2 [[ ]] Thus, Cyanamid's current interpretation of the claim is contrary to its original and long held interpretation.

102. The Polysorb suture contains over .25% moisture. (Levy Tr. 186–88; Geoffroy Tr. 1321–25 (.695% average); PX 19; PX 29; DX Z; DX EB).

### B. Cyanamid Testing of Polysorb

103. Although this Court does not agree with Cyanamid's interpretation of Claim 1 of the '622 patent, Cyanamid's testing of Polysorb will nonetheless be evaluated.

104. Cyanamid's failure to find infringement by testing for the moisture of the Polysorb suture as a whole led it to search for a testing technique that might determine the moisture associated with the components of Polysorb. (Levy Tr. 212–18; Longordo Tr. 364–66; DX AC). Dr. Levy was ultimately retained for that purpose.

105. Initially Dr. Levy was unsure whether such a test could be performed but he ultimately established a protocol that he believed would determine the moisture content only of the polymer component. (Levy Tr. 218).

106. In his protocol, Dr. Levy continued to test for, and determine, the moisture content of the suture as a whole but interpreted the results of the tests in a way that purports to distinguish between moisture derived from the glycerin and moisture derived from the

polymer component of Polysorb. (Levy Tr. 117; Longordo Tr. 309–11).

107. The Karl Fischer test apparatus employed by Dr. Levy cannot itself distinguish between water associated with the polymer and water associated with the glycerin. (Levy Tr. 199; Longordo Tr. 300–01; Wiles Tr. 1405–06; Schaefgen Tr. 1528–29, 1534–35). To arrive at their ultimate conclusions, however, Drs. Levy and Longordo interpreted the total moisture data obtained over time from the Polysorb sutures through slopes drawn on logarithmic plots of the titration data. (Levy Tr. 118–20); *see, e.g.,* (PX 33).

108. Cyanamid performed its analysis of Polysorb in a "glove box" or "dry box" that maintained its own internal environmental controls. (Longordo Tr. 259–60).

109. A controlled environment of 16% relative humidity was used to prevent the gain or loss of water moisture from the samples. (Longordo Tr. 274–75).

110. Inside the glove box, Dr. Longordo used rubber gloves to manipulate the instrumentation. An aluminum pan containing glass wool covered with a glycerol/water solution rested in the box to control the relative humidity. The glove box also contained a Sartorius balance and a microbalance capable of weighing in micrograms. Drs. Levy and Longordo performed the entire experiment, including the weighing of the suture and pad samples and the titration of the moisture in the suture, within the confines of the glove box. (Longordo Tr. 260–63, 271–74).

111. The environment in the glove box had a slightly higher relative humidity than the sealed package of the Polysorb suture product so that, upon removal from the package, the suture would not lose moisture. (Longordo Tr. 273–74).

112. The Polysorb sutures did not lose water moisture from the time they were opened until the time they were titrated, but they may have gained some moisture. (Longordo Tr. 275–76).

113. Glycerol is completely miscible with water and has solubility characteristics simi-lar to those of water. (Levy Tr. 86; Longordo Tr. 285; PX 27).

114. The Aquatest 8 titrator is a sealed titration vessel which contains a volume of liquid Karl Fischer reagent that is kept in a swirling motion by a spinning magnetic stirrer bar, with entry openings in the cover of the vessel for introducing a liquid or solid sample through an entry port. (Levy Tr. 58–61; Longordo Tr. 381–83; PX 55).

115. The Karl Fischer reagent is a substance that may be used when determining water in glycerol. (Levy Tr. 87).

116. The Aquatest 8 machine can detect moisture in microgram quantities. (Levy Tr. 40).

117. The Polysorb samples were analyzed using an Aquatest 8 moisture analyzer manufactured by Photovolt. (Longordo Tr. 252–53).

118. The Karl Fischer reagent is hygroscopic. (Longordo Tr. 232).

119. The Karl Fischer reagent is more hygroscopic than glycerol. (Longordo Tr. 233).[32]

120. Glycerin, water, and a 95%/5% glycerin/water mixture are soluble in Karl Fischer reagent. (Levy Tr. 86–88; Longordo Tr. 293–96). *But see* (Wiles Tr. 1411) ("That's true [but i]t's also irrelevant.").

121. Karl Fischer reagent does not react with glycerin. (Levy Tr. 110–11).

122. In the Karl Fischer titrator, the reagent penetrates the structure of the suture and neutralizes whatever water it finds until all of the water is extracted. (Levy Tr. 92, 102–03, 107–08).

123. The polymer in Polysorb is not soluble in Karl Fischer reagent. (Levy Tr. 92).

124. Drs. Levy and Longordo conducted Karl Fischer titration extractions on seven Polysorb samples. (Levy Tr. 117–18).

125. After gathering titration data for the Polysorb suture, Drs. Levy and Longordo entered the data on a computer that then generated graphs. (Levy Tr. 61).

**32.** The term "hygroscopic" is relative. (Longordo Tr. 303, 360).

126. The first type of graph showed the micrograms of water titrated over time. (Levy Tr. 65–66).

127. The second type of graph normalized all of the values in the experimental data to the same fractional basis and linearized the curve obtained in the first chart. This is referred to as a logarithmic or "log" plot. (Levy Tr. 68–69).

128. On the log plot, the horizontal axis is time. The vertical axis is moisture plotted as a fraction of the total moisture amount. In plotting the log graph, the incremental amount of moisture at a given time is subtracted from the total moisture to provide a value. That value is then divided by the total moisture, giving the percent of moisture remaining to be titrated. For example, if the total moisture value is 1,000 and the incremental value titrated is 10, 1,000 minus 10 equals 990. The 990 value is divided by the total moisture value (1,000), yielding a value of 99% water remaining to be titrated. Hence, 1% of the water was titrated at the first incremental time period. This kinetic methodology is used to normalize samples having different values so that the samples may be directly compared. (Levy Tr. 70–74).

129. Cyanamid contends that the log plots for the titration of the Polysorb samples show two rates of extraction, one fast and one slow. (Levy Tr. 74–78, 81, 103, 109, 117, 236–38); (Tanquary Tr. 600, 602–09, 611–12). The point of intersection between the fast extraction line and the slow extraction line on the vertical axis purports to indicate the amount extracted during the fast reaction. (Levy Tr. 118–129). After carrying out the Karl Fischer titration and plotting the data points on the log graph and obtaining the points of intersection of the "slow" and "fast" reactions, the information was tabulated in PX 49. (Levy Tr. 130–38). The fast rate of extraction (initial water) purportedly is the extraction of water from the glycerin "coating" of Polysorb and slower extraction purportedly is the extraction of the water from the polymer. (Levy Tr. 115–17); (Longordo Tr. 309–11, 313). From this analysis, Cyanamid contends that the average moisture content of the Polysorb suture polymer was 0.13% plus or minus 0.02% by

weight of the polymer. (Levy Tr. 136). Drs. Levy and Longordo also performed a Karl Fischer titration extraction on Cyanamid's Dexon suture and from that data prepared a log titration graph. In this graph, Cyanamid contends that the data shows a single slope indicating one mechanism of reaction. (Levy Tr. 97–98). Cyanamid attributes the differences between the results to the presence of a glycerin "coating" on Polysorb. For the reasons that follow, the Court does not accept Cyanamid's interpretation of its kinetic testing.

130. Cyanamid contends that the different slopes Dr. Levy attributes to the different components of Polysorb can be used mathematically to determine the moisture contents of the polymer and glycerin components of Polysorb. (Levy Tr. 117–20). All of Dr. Levy's calculations, however, assume that, before the so-called "break point" of the titration curve, i.e., the intersection point of Dr. Levy's two slopes, all of the moisture titrated comes only from the glycerin and that, after the break point, all of the moisture titrated comes only from the polymer. (Levy Tr. 190–93; Longordo Tr. 352–53).

131. Cyanamid's assumption is based upon a hypothetical model of the Polysorb suture depicted by Cyanamid in PX 48. In that model, the glycerin completely coats the surface of the polymer filaments in the Polysorb suture and none or a negligible amount of the glycerin is contained in the polymer. (Levy Tr. 164–74; Longordo Tr. 287, 309; Tanquary Tr. 563–64, 606–09, 713). The model is purportedly based upon a statement contained in U.S. Surgical's package insert that the Polysorb coating contains glycerin and on Cyanamid's interpretation of a description of Polysorb in U.S. Surgical's brief in opposition to Cyanamid's motion, wherein U.S. Surgical stated that the glycerin fill located throughout the suture is in intimate contact with all yarns and filaments. (Levy Tr. 164–66; Longordo Tr. 245–47, 287–91, 314–15; Tanquary Tr. 556–57).

132. From this hypothetical model of Polysorb, Cyanamid contends that the glycerin prevents the Karl Fischer reagent from extracting moisture from the polyglycolic acid filaments until all of the moisture from the

glycerin has been extracted. (Levy Tr. 208, 236–38); (Longordo Tr. 309, 314–15, 352–53).

133. If this hypothetical model, or the assumptions upon which it is based, is incorrect, Dr. Levy's calculated moisture content values are incorrect, and Cyanamid's proof of infringement necessarily fails in this respect. (Longordo Tr. 352–53; Tanquary Tr. 713).

134. Cyanamid's hypothetical model is not supported by the record.

135. The evidence shows that the outer surface of Polysorb is not covered with glycerin. Dr. Kaplan testified that the terpolymer coating and glycerin are not compatible, thus the terpolymer prevents the glycerin from coating the surface of the suture. (Kaplan Tr. 765–67) (confidential). Molecules of glycerin, however, will be present throughout the suture structure, moving in dynamic equilibrium. Some of these molecules will be on or at the surface of the Polysorb suture, some will be deep inside, and others will be scattered in between. *Supra* at 100; (Wiles Tr. 1408–11).

136. U.S. Surgical has shown that there is insufficient glycerin in Polysorb to coat all surfaces of all filaments. *Supra* at 100; (Kaplan Tr. 811–13; Wiles Tr. 1394). Dr. Kaplan testified that the surface area of a Polysorb suture is approximately 780 square centimeters and this area contains only a fraction of a drop of glycerin. (Kaplan Tr. 811–13). It is not possible that this small amount of glycerin can cover anything but a small portion of the filament surfaces of the Polysorb suture. (Kaplan Tr. 811–13). Therefore, significant portions of the polymer are exposed and accessible to the Karl Fischer reagent at the same time as the glycerin. (Longordo Tr. 351–52; Wiles Tr. 1393–95, 1404–06; Schaefgen Tr. 1718–19). In light of this testimony, the language in U.S. Surgical's brief to which Cyanamid cites in support of its hypothetical model does not prove that the glycerin component of Polysorb coats the entire surface of each and every filament.

137. Contrary to Cyanamid's model, glycerin actually enters the polymer. *Supra* at 100; *see, e.g.,* (Kaplan Tr. 810–11, 813; Wiles Tr. 1384, 1390–91; Tanquary Tr. 582–83 (negligible)). Dr. Wiles testified that a significant amount of glycerin enters the polymer filament. (Wiles Tr. 1394–95, 1455–56). The moisture from this glycerin would therefore be measured along with or after the moisture from the polymer. (Wiles Tr. 1404–06).

138. The Polysorb package insert was designed to identify Polysorb's components to the consumer without describing its structure in detail so as to prevent competitors from learning how Polysorb is manufactured. (Kaplan Tr. 816).

139. Cyanamid's hypothetical model is weakened by the existence of a dynamic equilibrium of the components of Polysorb within the suture structure. *Supra* at 99; (Wiles Tr. 1408–11). In this equilibrium, the glycerin, water, and polymer are in such intimate contact throughout the suture that individual glycerin and water molecules are in constant motion and traverse freely into and out of the polymer. *Supra* at 99; *see, e.g.,* (Longordo Tr. 311, 346–47; Wiles Tr. 1392–93; Schaefgen Tr. 1530–31; DX FY). Actual hydrogen bonding takes place between the three components. (Longordo Tr. 498–99; Tanquary Tr. 583–84; Wiles Tr. 1392; DX FY). Thus, it is not scientifically valid to partition the water molecules between the various components of Polysorb as Cyanamid suggests, since the water belongs to the system as a whole. (Wiles Tr. 1392–93, 1408–11; DX FY).

140. Dr. Longordo admitted that, as water from the glycerin is titrated, it will take with it water that is on the surface of the polymer. (Longordo Tr. 345–52). This confirms that moisture in the suture belongs to the system as a whole, and suggests that moisture Cyanamid believes was contained in the glycerin may actually have been associated with the polymer at the beginning of the titration.

141. Cyanamid's model cannot form the basis for assuming that all moisture from the glycerin is measured before any moisture from the polymer is measured. (Schaefgen Tr. 1522–23, 1694–95). Dr. Levy acknowledged that his interpretation was not exclusive by stating that his interpretation was "a reasonable way of looking at it." (Levy Tr. 117).

142. There is a more reasonable explanation for the shape of the titration and logarithmic curves obtained by Dr. Levy. Since moisture from deep inside the suture associated with both the glycerin and the polymer cannot be physically accessed by the Karl Fischer reagent before the moisture associated both with the glycerin and polymer in the outer, more accessible regions of the suture, (Wiles Tr. 1409–11; Schaefgen Tr. 1523–27, 1542–43, 1567–68, 1563–64), any differences in the shapes of titration curves of different sutures are more likely due to different levels of physical accessibility of moisture within the suture. (Wiles Tr. 1409–11; Schaefgen Tr. 1523–27, 1567–68).

143. Even assuming it was appropriate for Dr. Levy to draw slopes of his titration curve data, Cyanamid's assumption that the different slopes represent moisture from the different components of Polysorb is not credible, particularly since Cyanamid provided no evidence that its method of interpretation of the logarithmic curves is known to persons skilled in the art. (Levy Tr. 218; Longordo Tr. 475; Kaplan Tr. 780–81, 915; Geoffroy Tr. 1331; Schaefgen Tr. 1522–23, 1526–27).

144. Dr. Levy's own data support U.S. Surgical's contention that the shape of the titration curves are characteristic of polyglycolic acid sutures containing moisture, whether or not they contain glycerin. For example, the logarithmic plot of the moisture data collected by Dr. Levy from a sample of Dexon which contained significant amounts of moisture (19% RH), but which did not contain glycerin, showed a logarithmic plot consistent with Dr. Levy's two slope theory. (Schaefgen Tr. 1558–64; Longordo Tr. 424–25; DX FQ); see also (Longordo Tr. 468–70, 482, 488–91); (Schaefgen Tr. 1569–70, 1712–16) (rebutting Dr. Longordo's claim that the spent Karl Fischer reagent "coats" the equilibrated suture in a manner that Cyanamid believes is consistent with Polysorb); (Schaefgen Tr. 1548–50); cf. (Schaefgen Tr. 1565–66) (Sample 13A).

145. Similarly, the logarithmic plot of moisture data collected by Dr. Levy from a Polysorb sample in which the glycerin had been removed (Levy Tr. 199–201; Schaefgen Tr. 1564–65) exhibits what Cyanamid would construe as two slope lines that Dr. Levy attributes to the presence of glycerin. (DX EZ; DX FA).

146. These tests demonstrate that there is no correlation between the presence of glycerin and the shapes of the titration curves and slope lines relied upon by Cyanamid. (Schaefgen Tr. 1549–50, 1568–69).

147. The data also show that most of the moisture from these two samples, which do not contain glycerin, is titrated within the first one to two minutes. This is consistent with Dr. Levy's data for the Polysorb samples that contain glycerin and for bone-dry Dexon samples, further evidencing that the shape of the titration curve cannot be attributed to the presence of glycerin. (Levy Tr. 194–95; Schaefgen Tr. 1543–53, 1559–62, 1566; PX 46; DX EN; DX EQ; DX ER; DX ES; DX EU; DX EW).

148. The titration curves and slope lines for Polysorb upon which Cyanamid relies are characteristic of most solid substances containing moisture, including Dexon and other solid substances that do not contain glycerin. (Wiles Tr. 1407); (Schaefgen Tr. 1523).

149. Other data generated by Dr. Levy for Cyanamid are inconsistent with his assumptions and conclusions.

150. For example, Dr. Levy introduced logarithmic plots of two Dexon samples that allegedly display one slope in order to distinguish Dexon from Polysorb for which he claims to see two slopes. (Levy Tr. 97–99). The record shows, however, that the logarithmic plot of Dexon no longer exhibits a single slope when data points contained in Dr. Levy's notebook but not plotted by Dr. Levy are added to the plot. (Longordo Tr. 401–10; DX FU).

151. Dr. Levy tested other Polysorb sutures that failed to produce plots having two slopes, which further undercuts the validity of his assumptions and analysis. (Schaefgen Tr. 1572–75; DX FM; DX FO). These data, which are inconsistent with Cyanamid's contentions, were excluded at the instruction of Cyanamid's lawyers. (Longordo Tr. 418). Cyanamid's attorneys contend that these data were excluded because the Polysorb suture was of a different size. (Longordo Tr.

418; Pl.'s Post–Hearing Principal Br. at 11 n. 12). These Polysorb sutures were, however, actually closer in size to the Dexon sutures to which they were compared than the size of the Polysorb suture samples upon which Cyanamid relies for its infringement claim. (Schaefgen Tr. 1575–78). Even assuming the sutures were of different sizes, the data should have been included. "After all, a theory should fit all the sizes, all the data that's available. If you hold something out, you're not giving the public a real chance to see whether it checks the theory." (Schaefgen Tr. 1578).

152. Cyanamid relies upon the testimony of Drs. Tanquary and Longordo to validate Dr. Levy's method. However, Drs. Tanquary and Longordo both admitted that their analysis would differ if the outer surface of the Polysorb suture was not covered with glycerin. (Tanquary Tr. 713); (Longordo Tr. 351–53). Since the Court has found that there is not enough glycerin to coat the entire surface of every filament and since the glycerin in Polysorb is distributed within and throughout the filaments on a molecular level, their confirmatory testimony is not afforded weight because it was given on the basis of a model of the Polysorb suture that the Court does not accept.

153. Cyanamid's proof of infringement is weakened by the amount of data presented. Cyanamid presented the results of tests on seven sutures, four of which encountered experimental difficulties. (Levy Tr. 137–38; Longordo Tr. 387–98; PX 49; DX AF). Because the experiments, to be probative, need not be perfect in every way, these difficulties did not form a basis to reject the data itself. Likewise, U.S. Surgical's relative lack of experimental proof to the contrary is also not a significant issue. As stated previously, the interpretation of the data provided by Cyanamid is the significant issue.

154. Dr. Levy compared the results of the kinetic testing with an analysis of the pad contained in the Polysorb package, from which he purported to calculate the moisture content of the polymer in Polysorb. (Levy Tr. 139–41, 152, 154); (Tanquary Tr. 622–24); (Schaefgen Tr. 1585–93); (PX 51 & 52). The testimony of the experts demonstrated that the calculations were flawed in that they did not take into account moisture held by the cellulose of the pad which Dr. Levy attributed solely to the glycerin. (Levy Tr. 219–21; Longordo Tr. 440–43, 502; Schaefgen Tr. 1590–91; Tanquary Tr. 2129; Kaplan Tr. 913–14). The significance of this flaw, however, is in dispute. Dr. Schaefgen testified that, if the paper pad contained merely 1–2% moisture and if other corrections were made, then Dr. Levy's calculated moisture content of the suture polymer would be .41% by weight. (Schaefgen Tr. 1595–96). Dr. Tanquary, in rebuttal, testified that Dr. Schaefgen used an improper number to represent the amount of moisture absorbed by the cellulosic pad in recalculating the amount of absorbed water moisture in the polymeric portion of the suture. (Tanquary Tr. 2123–29, 2133–35). In any event, Dr. Tanquary testified that the amount of water absorbed in the pad fibers itself would be negligible. (Tanquary Tr. 628–29, 712).

In his testimony at Tr. 1595–96, Dr. Schaefgen was in error about the amount of water absorbed in the fibers of the pad that is represented by a 2% adjustment. However, taking all of Dr. Schaefgen's adjustments into consideration, the Court derived a number of 0.28727%.[33] It would, of course, be helpful to obtain calculations as to each individual sample before averaging and taking into account the 2% moisture-in-the-pad adjustment. On this issue, more analysis is needed because this one calculation demonstrates that the amount of absorbed moisture in the "polymeric portion" of the suture is outside the claim limitation, and the result nonetheless diverges significantly from the results of the kinetic testing and thus fails to cross-check that data.

---

**33.** By using sample 35G as a benchmark and subtracting 2% moisture from the 50A sample pad, as Dr. Schaefgen counselled, the calculation would be as follows:
.02 × 1.542 = .03 ★★★ 1.542 − .03 = 1.512 ★★★ 1.512/29 = .052/1 = 5.2/100 ★★★ Sample 35G .112 × 129 = 14.448 ★★★ 5.2/100 = × /14.448 ★★★ × = 5.2 × 14.448/100 = 75.-1296/100 = .75 ★★★ 1.066 − .75 = 3.16 ★★★ .316/110 × 100 = 0.28727%

Dr. Tanquary, moreover, testified that, although the amount of water absorbed in the cellulose pad would be negligible, it "probably" would be more than 1–2%. In conclusion, he stated: "Where it stops, I don't know. It's going to be very small." (Tanquary Tr. 2128). Hence, the sum of the evidence about the ratio of glycerin/water in the pad to glycerin/water in the "coating" is inconclusive. At trial, these tests may, however, prove to be probative.

155. The final piece of evidence that Cyanamid relies upon is PX 53 and 54, U.S. Surgical's internal document entitled "Moisture Evaluation Lactomer." From Dr. Levy's analysis and testimony, Cyanamid contends that the moisture within the polymeric portion of Polysorb is .11% (Levy Tr. 156–62, 222–24; PX 53; PX 54).

Dr. Kaplan, however, testified that the purpose of this experiment was to determine the amount of moisture within the package at a certain level of glycerin when it was opened. The 0.5% moisture target was used because "[w]e found if we had less moisture than that, we couldn't get the suture out of the package." (Kaplan Tr. 919–20); *see also* (Tanquary Tr. 646) (graph shows a 5% target for the product). Essentially, the parties agree that the graph shows a 5% minimum target, but they again differ on the purpose and interpretation of the data.

Dr. Schaefgen testified that, without more information regarding the product, the testing conditions, or the method of performing the experiment, the evidence could not be a valid independent check of Dr. Levy's kinetic experiments. (Schaefgen Tr. 1583–85).

On the present record, PX 53 and 54 are inconclusive.

## IV. IRREPARABLE HARM

156. Cyanamid has not met its burden of demonstrating irreparable harm, the *sine qua non* of preliminary, injunctive relief.

157. Until 1991, the suture market comprised primarily two companies, Johnson & Johnson and Cyanamid, both of which sold a full-line of sutures, including synthetic absorbable sutures. (PX 75; Knarr Tr. 765–66). Johnson & Johnson and Cyanamid control 95% of the U.S. market, which totals in excess of $547 million in annual sales. (Brandt Tr. 1033, 1117; Clifford Tr. 1195; PX 75; PX 76A).

158. The suture market comprises synthetic absorbable sutures, gut sutures (non-synthetic absorbable), and nonabsorbable sutures. (Tanquary Tr. 541–42); (PX 75). As of 1990, Johnson & Johnson's Ethicon division held 82.1% of the total dollar suture market in the United States, which is up from its 79.6% market share in 1985. As of 1990, Cyanamid's Davis & Geck division held 12.5% of the total dollar suture market in the United States, which is down from its 14.6% market share in 1985. (PX 75). Cyanamid's sales and market share have therefore been declining for some time and before U.S. Surgical entered the sutures market. (Brandt Tr. 1102–06; Knarr Tr. 1785–86; PX 75; DX EC).

159. Until 1991, Johnson & Johnson's Ethicon division and Cyanamid's Davis & Geck division were the only two companies selling synthetic absorbable sutures in the United States, with Ethicon holding 84% of the dollar sales and Davis & Geck holding the remaining 16% of the dollar sales. (Brandt Tr. 1052; PX 75).

160. Cyanamid developed and patented synthetic absorbable sutures in the 1960's. (e.g., PX 67; PX 72). The original patent on the polyglycolic acid suture, U.S. Patent No. 3,297,033 (the "Schmitt '033 patent"), issued in 1967 and expired in 1984. (PX 72). The remaining patent in the series is the Glick '622 patent, which issued on January 23, 1979, and is the subject of this litigation. (PX 1).

161. In 1971 Cyanamid introduced the first synthetic absorbable suture, Dexon. (Clifford Tr. 1268). In 1974 Johnson & Johnson introduced a competitive synthetic absorbable suture, Vicryl. (Clifford Tr. 1268–69). Dexon and Vicryl have been manufactured and packaged "bone dry" in accordance with the series of Cyanamid patents. (PX 1; PX 67; PX 72; Kaplan Tr. 781).

162. During the 1970's (and to this date) Cyanamid and Johnson & Johnson competed in the suture market, but they also engaged

in patent litigation relating to their synthetic absorbable sutures. In 1978, however, Cyanamid and Johnson & Johnson settled the litigation in an agreement that granted Johnson & Johnson immunity from suit under certain patents, including the '622 patent. Johnson & Johnson likewise granted Cyanamid immunity from suit under some of its patents. (Clifford Tr. 1241–42; DX BY (Settlement Agreement dated Nov. 16, 1978)). Hence, prior to U.S. Surgical's entry, Cyanamid had licensed away its right to be the sole supplier of synthetic absorbable sutures.

163. In a letter dated February 6, 1990, Donald Droste, Vice President and General Counsel of Cyanamid, wrote to George Frazza, Vice President and General Counsel of Johnson & Johnson, and enclosed a copy of the complaint in Cyanamid's first action against U.S. Surgical regarding the '622 patent. The letter refers to Cyanamid's "commitment to enforcement of the dry package patent," and states that Cyanamid had tested samples of Johnson & Johnson's PDS monofilament suture, found them to be outside the product definition of the 1978 settlement agreement, and found them (apparently in accordance with the testing method disclosed in the patent) to infringe the '622 patent. (Clifford Tr. 1244–49; DX BW). In this letter, Droste advised that Cyanamid "cannot permit the situation with Ethicon to go unresolved" and asked Frazza to "call [me] with your thoughts." (DX BW). There is no evidence of a response, and Cyanamid has not brought an action against Johnson & Johnson. (Clifford Tr. 1248–49). Cyanamid contends that this letter constitutes a notice letter, putting Johnson & Johnson on notice that it is infringing the '622 patent and thereby stopping the period of delay that Johnson & Johnson might assert in a laches defense, and U.S. Surgical contends that the letter evidences an agreement in violation of the antitrust laws. On the present record, the ultimate significance of this letter as it relates to the misuse of the patent in violation of the antitrust laws is inconclusive. This letter does, however, have significance insofar as it adds to the totality of Cyanamid's conduct towards its longstanding competitor that is inconsistent with a claim that Cyanamid will be irreparably injured unless an injunction issues against U.S. Surgical, its newest competitor.

In addition to the settlement agreement between Cyanamid and Johnson & Johnson, Johnson & Johnson's PDS sutures have been on the market since 1984, and, by 1990, Johnson & Johnson's sales of PDS exceeded $11 million. (DX GD; PX 75).

164. At present levels of technology and application, the total suture market is mature because there has been little unit growth in sales for the last five years. (PX 75; Brandt Tr. 1052, 1088–90; Knarr Tr. 1800–01, 1823–24). The use of synthetic absorbable sutures, however, has increased steadily and is expected to continue growing in the future. (PX 75; Knarr Tr. 1783–84 ("Synthetic absorbables are the fastest growing segment of suture materials."), 1801–02; Brandt Tr. 1111–13). In addition, U.S. Surgical has received two patents on Polysorb. (DX V; DX W).

165. Since the 1970's, when Dexon and Vicryl were introduced, synthetic absorbable sutures have changed little. (Knarr Tr. 1800–01). Initially, both Davis & Geck's Dexon and Ethicon's Vicryl were manufactured without a coating. Ethicon then released a coated Vicryl and captured more of the market "because an uncoated material had certain properties that make it very rough and[,] when it goes through tissue, it would tend to saw or tear." (Clifford Tr. 1198). Over the ensuing years, moreover, Davis & Geck's competitive responses to Ethicon's coated Vicryl were unsuccessful. (Clifford Tr. 1272–73). Last year, however, Davis & Geck began selling Dexon II to compete more effectively. Dexon II is packaged "bone dry," but is promoted as having an improved coating, which allows for better tying characteristics and less tearing. (Brandt Tr. 1051; Clifford Tr. 1192–93, 1197–98). Mr. Clifford characterized Dexon II as "very successful." (Clifford Tr. 1273).

166. Although synthetic absorbable sutures such as Dexon and Vicryl have features that nonabsorbable and nonsynthetic absorbable sutures do not, Dexon and Vicryl suffer from some perceived deficiencies, such as roughness and stiffness, that cause tissue

trauma and less than optimal handling characteristics during surgery. (Kaplan Tr. 747–50, 768; Corbitt Tr. 1738–40, 1746–47; Knarr Tr. 1766, 1772–73, 1775; Clifford Tr. 1198).

167. When developing its synthetic absorbable suture, U.S. Surgical addressed these perceived deficiencies and also promoted improvements in the packaging and needle quality of all of its suture products. (Kaplan Tr. 747–50, 759–60, 792; Knarr Tr. 1766; DX V; DX W).

168. Although U.S. Surgical is targeting Johnson & Johnson with its suture introduction, (Knarr Tr. 1836), U.S. Surgical's sale of synthetic absorbable sutures will cause Cyanamid to lose some sales of synthetic absorbable sutures and market share for such sutures. (Brandt Tr. 1051–53); (Knarr Tr. 1823–24). For example, Waterville Osteopathic Hospital ceased purchasing sutures from Cyanamid in September 1991. (Gulezian Tr. 1132–37). That hospital now buys all of its sutures from U.S. Surgical. (Gulezian Tr. 1146–48).

169. In general, hospitals prefer to simplify their purchasing processes. (Brandt Tr. 1053).

170. By purchasing a full line of sutures from one manufacturer, a hospital may obtain bulk quantity discounts and more personalized service. (Corbitt Tr. 1750–51).

171. A hospital purchasing synthetic absorbable sutures from one supplier will likely also purchase nonsynthetic absorbable and nonabsorbable sutures from the same supplier. (Brandt Tr. 1054). This is not always the case, however, because of surgeon preference. (Knarr Tr. 1830).

172. Synthetic absorbable sutures are "the motor that drives the suture line." (Knarr Tr. 1783–84). In other words, the success of a company selling a full line of sutures will depend upon the competitiveness of its synthetic absorbable suture products.

173. At every hospital to which U.S. Surgical sells synthetic absorbable sutures, it will also promote and sell its nonsynthetic absorbable and nonabsorbable suture products. These other suture products include Surgipro, Surgigut, Sofsilk, Bralon, Monosof, and Surgidac. (Knarr Tr. 1829–32; DX BQ).

174. Because many hospital purchasing departments would like to buy from one suture vendor, U.S. Surgical's sales of synthetic absorbable sutures will cause Cyanamid to lose some sales of nonsynthetic absorbable and nonabsorbable sutures. (Brandt Tr. 1051, 1053–56); (Clifford Tr. 1239); (Knarr Tr. 1823–24, 1830–31). Surgeon preference, however, prevents this phenomenon from occurring in every case. (Knarr Tr. 1830).[34]

175. Before U.S. Surgical's entry into the market, Johnson & Johnson was the only company offering a full line of suture, stapler, and clip products. U.S. Surgical offered stapler and clip products, but not sutures. Cyanamid offered sutures and some other medical products through its Davis & Geck division, e.g., needles. Johnson & Johnson was leading in suture sales, with Cyanamid a distant second. U.S. Surgical was the leading seller in staplers and clips, with Johnson & Johnson in second position. (Clifford Tr. 1195–96; PX 75; PX 76A).

176. Hospitals have put sutures out to bid separately from staplers and clips to ensure competitive bidding on all product lines. Now that U.S. Surgical has introduced sutures and become the second company to offer a full line of wound closure products, it is possible for hospitals to bundle sutures, staplers, and clips in a single contract and still receive competitive bidding. Cyanamid contends that, since it does not offer clips

---

**34.** Cyanamid's lost sales of nonsynthetic absorbable and nonabsorbable sutures due to U.S. Surgical's entry into the market and suture bundling within hospitals initially presented a case for finding irreparable harm. Upon consideration, however, the Court finds that the license given to Johnson & Johnson, presumably negotiated at arms length, must have contemplated and placed monetary value on the likely, but not universal, market effects of a synthetic absorbable suture, at least in those hospitals that decided to purchase Johnson & Johnson's suture line. A royalty under that license, if found to be reasonable and established, see *Medtronic, Inc. v. Telectronics, Inc.*, 686 F.Supp. 838, 844–45 (D.Colo.1987), would therefore form a minimum threshold for awarding damages if Cyanamid ultimately succeeds on the merits. 35 U.S.C. § 284 (Damages awarded in a patent infringement action must be "adequate to compensate for the infringement, but in no event less than a reasonable royalty . . . .").

and staplers, other than external skin staplers, it will not be able to bid for such bundled contracts, if any. (Brandt Tr. 1053–55; Gulezian Tr. 1135–37). This testimony is, however, nothing but speculation about how hospitals will prepare contracts for bid in the marketplace once U.S. Surgical began offering a full line of wound closure products. It is equally plausible that hospitals will continue to send out suture contracts for bid in the same manner and receive the benefit of more competitive bidding (i.e., three competitors) for the suture business. Moreover, this testimony suggested possibilities, not reasonable probabilities or actual instances of such contracting in the marketplace. No evidence was presented to show that Cyanamid is or would be directly or constructively barred from the market on this basis. Indeed, as to New England Medical Center's second contract, Cyanamid bid for, and won, a contract for suture business that included products both within and outside Cyanamid's wound closure product line. (Gaudette Tr. 1178). Dr. Brandt, moreover, testified that, if Cyanamid had a competitive, innovative product, a competitive sales force, brand loyalty, competitive service, and sound management, it could compete effectively in the marketplace without having a full line of wound closure products. (Brandt Tr. 1101–02; Knarr Tr. 1796–97). Even if the result feared by Cyanamid occurs, the loss of market share and sales can be compensated in money damages, especially since Cyanamid has not presented credible evidence that it will be put completely out of business by U.S. Surgical's entry into the suture market. On this issue, Cyanamid only presented evidence that the loss of sales may take Cyanamid out of the "considered set" of competitors in the market, (Brandt Tr. 1072), and that the loss in sales would lead to a reduction in expenditures on research and development, manufacturing improvements, and sales and marketing capabilities. (Brandt Tr. 1071). The Court finds overstated Cyanamid's portrayal of itself inevitably as a minor player in the suture business and as a company in irreversible decline because of U.S. Surgical's competitive threat. On the contrary, for several years and before U.S. Surgical entered the sutures market, Cyanamid has been losing market share to Johnson & Johnson in synthetic absorbable sutures and in sutures generally, (Brandt Tr. 1102–06; Knarr Tr. 1785–86; PX 75; DX EC), some of which may be attributable to Cyanamid's delayed competitive response (Dexon II) to Johnson & Johnson's Vicryl and some of which may be attributable to Cyanamid's sales and marketing practices. (Gaudette Tr. 1160–61, 1164; Gulezian Tr. 1138–39; Knarr Tr. 1788–91). Moreover, Davis & Geck has the substantial resources of Cyanamid behind it, and Cyanamid has introduced Dexon–II to compete more effectively with Johnson & Johnson's Vicryl. Cyanamid has also shown that not every hospital faced with the choice of converting to U.S. Surgical's sutures will do so. Cyanamid showed that Polysorb was used, tested, and evaluated at the John F. Kennedy Hospital, but that the staff voted against purchasing Polysorb sutures. (Zeide Tr. 1810–15); see also (Gaudette Tr. 1159). Dr. Zeide himself used the sutures and encountered some difficulties. (Zeide Tr. 1810–14). Obviously, surgeon preferences, which vary greatly, (Kaplan Tr. 839), play a large part in generating sales.

177. Cyanamid, moreover, contends the competition between Johnson & Johnson and U.S. Surgical would damage Cyanamid disproportionately because it is the smallest competitor in the overall wound closure market. (Brandt Tr. 1056). As a result of U.S. Surgical's entry into the suture business, Cyanamid's loss of sales and market share may be proportionately greater than Johnson & Johnson's loss. (Brandt Tr. 1051); (Clifford Tr. 1227). Even if true, this possibility does not render Cyanamid's harm irreparable. Moreover, Cyanamid's claim that it will be disproportionately injured in the marketplace is countered by U.S. Surgical's primary marketing effort against Johnson & Johnson, the market leader, by U.S. Surgical's primary targeting of Johnson & Johnson customer hospitals, (Knarr Tr. 1824–25), and by Cyanamid's introduction of a new product, Dexon II, which is designed specifically to compete with Johnson & Johnson's Vicryl.

178. The evaluation of Cyanamid's sutures at a hospital may take from three weeks to as long as three months. If that

evaluation is successful, Cyanamid will bid for the business. This process includes collecting information and data, drafting a contract, and obtaining contract approval from the area director, national sales manager, or vice president of sales and marketing. This bidding process takes from two days to two weeks. (Gaudette Tr. 1165–70).

179. The New England Medical Center entered into a sutures contract with Cyanamid in 1981. That contract was scheduled to last into 1991, but was put out for re-bid on external and internal wound closure products before termination, some of which were not in Cyanamid's product line. (Gaudette Tr. 1178). Cyanamid not only bid on the contract that included products outside its line, but also was awarded the sutures portion of the second contract. Cyanamid, however, claims that the effort spent in submitting the second bid cannot be calculated in dollar value, claims that it is a cost that cannot be recovered if Cyanamid succeeds on the merits, and claims that the re-bid was caused by U.S. Surgical's entry into the market. (Gaudette Tr. 1170–75). Mr. Gaudette, however, testified that contract negotiations and approval are part of the company's regular business and involve collecting and providing information. (Gaudette Tr. 1169–70); (Knarr Tr. 1829) ("[T]here are hospitals that will evaluate [a competitor's] product before they sign a contract with us[;] [t]hat happens every time a contract comes up for bid on any product."). Cyanamid, moreover, presented evidence regarding only this one contract and failed to submit evidence that any such harm resulted from U.S. Surgical's entry into the market or would occur continually throughout the pendency of this suit. In sum, the kind, scale, and scope of this harm is insufficient to find the irreparable harm necessary for a preliminary injunction.

180. According to U.S. Surgical's Quarterly report for the Second Quarter of 1991, U.S. Surgical has signed "sole source suture contracts" with AmeriNet and with Health Services Corporation of America and "plans a phased-in introduction of its sutures to hospital members of both purchasing groups over the next year." (DX CU).

181. Cyanamid has [[ ]] accounts in the New England area, and [[ ]] of those accounts are a part of the AmeriNet group. If Cyanamid suffers more conversions of the [[ ]] accounts within the AmeriNet group, like the conversion of Waterville Osteopathic Hospital, Cyanamid claims its business in the New England region alone would decrease by over $2 million. (Gaudette Tr. 1180–82). Cyanamid also maintains roughly [[ ]] in suture business with AmeriNet member hospitals nationwide. As U.S. Surgical's entry into the market continues, Cyanamid contends that the impact would be severe. (Clifford Tr. 1227–28). This harm, however, is not irreparable because Cyanamid may be compensated adequately with money damages. These group purchasing contracts, moreover, do not guarantee business for the supplier. The situation at Waterville Osteopathic Hospital, a member of the SynerNet group that has a purchasing agreement with Cyanamid, is a case in point. (Gulezian Tr. 1131–33). Each member hospital must elect to purchase from a particular supplier and sign an independent contract with that supplier. (Gulezian Tr. 1142, 1147; Knarr Tr. 1793–96).

182. Mr. Knarr, U.S. Surgical's Vice President of Marketing, believes that U.S. Surgical will capture a significant share of the sutures market. He testified that U.S. Surgical will attempt to capture as much market share as it can in the next two to four years. (Knarr Tr. 1837, 1844).

183. In the next two to three years, U.S. Surgical may obtain between 10–15% of the United States sutures market. (Brandt Tr. 1062, 1068). Lost market share, however, is not in the Court's view irreparable harm, nor has it been proved to be likely that this market share will be obtained disproportionately at the expense of Cyanamid.

184. Cyanamid introduced its new synthetic suture, Dexon–II, in July 1990. Dexon–II was specifically designed to compete with Ethicon's Vicryl suture. The Dexon–II launch went national in January 1991. (Clifford Tr. 1210–12, 1271–72).

185. A company introducing a new product would prefer to "have as little noise as possible in the market" so that attention of

potential customers will not be diverted. (Brandt Tr. 1069).

186. U.S. Surgical's promotion and sale of Polysorb will adversely affect Cyanamid's Dexon–II product launch. (Brandt Tr. 1051, 1069–70); (Clifford Tr. 1240). This harm would nonetheless be measured in lost sales and market share, which is not irreparable, because Cyanamid has not demonstrated to (or persuaded) the Court that it would lose (or receive less of a return on) its investment in the new product.

187. Although a successful Cyanamid suture evaluation was conducted and completed at the University of Michigan, the hospital postponed its decision whether to purchase Cyanamid's sutures. (Clifford Tr. 1215–18); (Knarr Tr. 1827–29). This evidence, however, does not demonstrate irreparable harm to Cyanamid because the actual harm would occur only when the hospital decided not to buy Cyanamid sutures in favor of U.S. Surgical sutures. This harm, as stated previously, is also compensable in money damages, and the steps taken in contract formation, including testing delays, information gathering, and negotiation, are a regular part of the business in this market.

188. Cyanamid contends that, if U.S. Surgical continues to sell sutures during the pendency of this litigation, the damage, even if U.S. Surgical is enjoined after trial, would be irreversible. (Brandt Tr. 1051–52, 1070–77). If U.S. Surgical is enjoined after the outcome of this proceeding, Cyanamid contends that it may not be able to recapture its lost market share. However, if Cyanamid succeeds after a trial on the merits, not only will it be compensated for its lost sales and market share but also U.S. Surgical will no longer compete in the sutures business without a synthetic absorbable suture. Hence, both Johnson & Johnson and Cyanamid will therefore consume that lost market share. Cyanamid contends that the costs associated with recapturing U.S. Surgical's market share, advertising costs, promotional costs, and customer call costs, would be irreparable. However, Cyanamid will be incurring those same costs regardless of the outcome of this action, for Cyanamid surely will not concede market share to U.S. Surgical during the pendency of this action.

In this same line of argument, Cyanamid states that it is common knowledge in the industry that the cost to regain a customer is between four and five times the cost of holding the customer. (Brandt Tr. 1072); (Clifford Tr. 1230–31, 1238–39). This statistic, however, assumes that the market participants remain the same. If U.S. Surgical is ultimately enjoined in this action, the amount of competition is significantly reduced, rendering this statistic meaningless in determining irreparable harm.

189. Cyanamid is a multi-billion dollar corporation, with cash and marketable securities in 1990 of $400 billion. In its medical divisions, Cyanamid reported in excess of $2.3 billion in sales in 1990. (Clifford Tr. 1277–78, 1286; DX BT). Revenues lost as a result of U.S. Surgical's entry into the sutures business will be a small part of Cyanamid's business. (Clifford Tr. 1277–78; DX BT). Cyanamid contends, however, that the size of the corporation should be ignored, with the Court instead focussing the irreparable harm inquiry on Davis & Geck alone. Cyanamid, of course, is the party to this action and does business through its Davis & Geck division. Each division of Cyanamid is run as a profit center and is expected to show a profit each year. The division is also evaluated on return on investment, return on assets, and return on sales. (Brandt Tr. 1073–74; Clifford Tr. 1286–88). These facts, however, should not detract from the focus of the irreparable harm inquiry nor should the Court ignore that Davis & Geck has the substantial resources of Cyanamid behind it.[35] If, for example, Cyanamid had persuaded the Court that Davis & Geck would likely go out of business during the pendency of this action because of U.S. Surgical's entry into the market, this would have been evidence of irreparable harm to both Cyanamid and Davis & Geck. Cyanamid has, however, only demonstrated the likely loss of some

---

35. *Hybritech Inc. v. Abbott Lab.*, 4 U.S.P.Q.2d (BNA) 1001, 1015, 1987 WL 123997 (C.D.Cal. 1987) ("Moreover, while Hybritech is a relatively small company, it has the resources of Eli Lilly & Co. behind it."), *aff'd*, 849 F.2d 1446 (Fed.Cir. 1988).

sales and market share, which is not irreparable. Hence, whether the entity to be considered is Cyanamid or Davis & Geck, this Court does not find the irreparable harm necessary for the grant of a preliminary injunction.

190. U.S. Surgical has the financial resources to compensate Cyanamid for any money damages during the pendency of this suit. (PX 82).

## V. THE BALANCE OF HARDSHIPS

191. The balance of hardships weighs heavily in favor of U.S. Surgical.

192. An injunction prohibiting U.S. Surgical from making or selling Polysorb will put U.S. Surgical out of the sutures business during the pendency of this action, which is a manifestly inequitable result. Synthetic absorbable sutures are the most important product in a vendor's suture line, and, given hospitals' reluctance to purchase or even evaluate sutures from a company that does not have a full line, an injunction prohibiting the manufacture and sale of Polysorb would effectively (although not literally) encompass all of U.S. Surgical's suture line, which includes many nonaccused products. Consequently, without a synthetic absorbable suture, U.S. Surgical would likely close down its entire suture business. (Brandt Tr. 1053–55; Corbitt Tr. 1750–51; Knarr Tr. 1783–84, 1830).

193. A preliminary injunction would have a serious financial impact on U.S. Surgical. U.S. Surgical has invested over $50 million, built and expanded manufacturing facilities, purchased new equipment, and hired and trained over 1,000 people in connection with its effort to enter the suture market. (Knarr Tr. 1763–64). If enjoined, U.S. Surgical would unquestionably suffer dollar losses in the millions. (Knarr Tr. 1798–99). Although there is evidence in the record that the increased competition generated by U.S. Surgical's entry into the market will cause Cyanamid and Johnson & Johnson to lose sales and market share, the Court is not persuaded that Cyanamid will suffer disproportionately because of the marketing strategy of U.S. Surgical, the market share held by Johnson & Johnson, and Cyanamid's intro-

duction of an improved product, Dexon II, which is designed to compete more effectively with Johnson & Johnson's Vicryl. The Court is also not persuaded that the mere presence of U.S. Surgical in the suture market will lead to automatic conversions of hospitals to Polysorb because the evidence, Waterville Osteopathic and JFK Memorial, is conflicting and did not present a basis to find that cross-bundling of product lines (e.g., sutures and clips) was a phenomenon that would directly or constructively bar Cyanamid from the suture market. Bundling within the suture line for reasons of convenience, economy, and service is, however, a prevalent phenomenon in the market, but does not disadvantage Cyanamid vis-a-vis U.S. Surgical on this record.

The result, moreover, of a preliminary injunction on U.S. Surgical is certain to lead to immediate dollar losses in the millions and to losses in goodwill. The losses to Cyanamid resulting from the denial of the motion for a preliminary injunction are less certain in scope and are nonetheless compensable in money damages. In addition, because sutures are technically sophisticated products and a hospital does not normally switch to a new product without substantial testing and feedback from resident surgeons, (Pl.'s Proposed Findings of Fact ¶ 166), because sutures take time to evaluate and test, (Gaudette Tr. 1165–70), and because two new suture products have recently been released in the market, the dollar losses to Cyanamid from the sale of Polysorb will be much less immediate and severe than the wholesale removal of all U.S. Surgical suture products from the market.

194. An injunction would lead to the termination of hundreds of U.S. Surgical employees in a variety of areas from manufacturing to sales. (Knarr Tr. 1798–1800). The potential for job losses at U.S. Surgical if U.S. Surgical is enjoined is greater than the potential for job losses at Cyanamid if U.S. Surgical is not enjoined.

195. An injunction would damage U.S. Surgical's reputation and customer relationships. Over the past twenty-five years, U.S. Surgical has established contacts and good-

will with numerous health care facilities. U.S. Surgical has established this goodwill in substantial part because it has provided superior service and innovative products, (Brandt Tr. 1082–83), and a preliminary injunction would frustrate U.S. Surgical's ability to meet its customers' needs and hurt its reputation. (Knarr Tr. 1800–03). Cyanamid will not suffer a comparable injury to its goodwill and reputation from the denial of its motion for a preliminary injunction.

196. U.S. Surgical would not be fully compensated for its losses if it was enjoined now and later won on the merits. Conversely, Cyanamid will be compensated for its injury in money damages if it later succeeds on the merits.

197. Cyanamid argues that U.S. Surgical entered this market and made its investments at its own risk, knowing that Cyanamid would assert the '622 patent against Polysorb. (Kaplan Tr. 779; Knarr Tr. 1833–34). This argument simply begs the ultimate question, only resolved preliminarily by the denial of Cyanamid's motion, which is whether Polysorb infringes the '622 patent. U.S. Surgical, moreover, provided testimony that, before entering the market, it never considered Polysorb an infringement of the '622 patent. *See, e.g.,* (Knarr Tr. 1833–34).

198. The denial of a preliminary injunction in this case will maintain the status quo pending a full trial on the merits after full discovery.

## VI. PUBLIC INTEREST

■ 199. The effect on the public interest by the grant or the denial of the motion for a preliminary injunction is in equipoise.

200. Polysorb is promoted as having several benefits over the competition in terms of handling, packaging, absorption, tensile strength, and relative tissue trauma. (Kaplan Tr. 748–49, 768, 776–78; Corbitt Tr. 1737–43, 1746–47; Knarr Tr. 1769, 1771–76). Some surgeons prefer Polysorb because of these promoted benefits. Some surgeons in

some specialties, however, have encountered difficulties with Polysorb, and U.S. Surgical has endeavored to satisfy those potential customers with adjustments in the product. (Zeide Tr. 1811–14; Kaplan Tr. 774, 912; Corbitt Tr. 1748–49; Knarr Tr. 1786–87, 1802, 1844–45). Because of these difficulties or generally because of surgeon preference, some surgeons prefer suture products other than Polysorb.

201. The medical and surgical communities are interested in evaluating Polysorb and comparing it with the competition. (Knarr Tr. 1786–88).

202. A preliminary injunction would, during the pendency of this action, take U.S. Surgical's suture products off the market, reduce competition in the market significantly, and render it impossible for the medical community to evaluate Polysorb and decide whether to purchase the product in light of their, or their patients', needs.

203. Increased competition in the marketplace is in the public interest. U.S. Surgical is a new entrant in a market that has been dominated for years by two competitors who have cross-licensed each other and who sell the principal suture product (synthetic absorbable) under the teachings of a single patent. (DX BY).[36]

204. A preliminary injunction against U.S. Surgical that would lead to the termination of hundreds of employees in these difficult economic times is not in the public interest. (Knarr Tr. 1799–1800).

205. Before U.S. Surgical entered the suture market, little product innovation had occurred in years. (Knarr Tr. 1766, 1800–01).

206. The public has an interest in encouraging research and development through the protection afforded by the patent laws. Hence, the public interest is served by protecting the rights of the patent holder.

---

**36.** On the present record, the Court is unable to determine whether Cyanamid and Johnson & Johnson unlawfully attempted to prevent U.S. Surgical from entering the market or misused the '622 patent in violation of the antitrust laws. (Clifford Tr. 1228–29, 1242, 1249; DX BW; Def.'s Proposed Findings Fact ¶ 20–21; DX BY).

## CONCLUSIONS OF LAW

### I.

■ 1. This matter is before the Court after a hearing on a motion for a preliminary injunction, not after a full trial on the merits. 35 U.S.C. § 283. In this situation, and particularly where there is a demand for a jury, the Court's findings and conclusions are necessarily tentative. *University of Tex. v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 18, 68 L.Ed.2d 175 (1981).

■ 2. A preliminary injunction is a drastic remedy, and such relief is granted only in extraordinary circumstances. *Illinois Tool Works, Inc. v. Grip–Pak, Inc.*, 906 F.2d 679, 683 (Fed.Cir.1990); *cf. ACA Prods., Inc. v. Reuben H. Donnelley Corp.*, 212 U.S.P.Q. 419, 422, 1980 WL 30352 (D.Conn. 1980).

■ 3. The issuance of a preliminary injunction lies within the sound discretion of the court "after a hearing in which neither party [is] required to prove his case in full and in light of findings and conclusions *not binding* at trial." *Illinois Tool Works, Inc.*, 906 F.2d at 681 (citations omitted) (emphasis in original).

■ 4. The party seeking an injunction "must establish a right thereto in light of four factors: (1) a reasonable likelihood of success on the merits; (2) irreparable harm; (3) the balance of hardships tipping in favor of the requesting party; and (4) that the issuance of an injunction is in the public interest." *Chrysler Motors Corp. v. Auto Body Panels of Ohio, Inc.*, 908 F.2d 951, 952 (Fed.Cir.1990); *see also Illinois Tool Works, Inc.*, 906 F.2d at 681; *Hybritech Inc. v. Abbott Lab.*, 849 F.2d 1446, 1451 (Fed.Cir. 1988); *H.H. Robertson Co. v. United Steel Deck, Inc.*, 820 F.2d 384, 387 (Fed.Cir.1987).

5. No one factor is dispositive, and the Court, exercising its discretion, must balance each factor against the others and against the magnitude of the relief sought. *Chrysler Motors Corp.*, 908 F.2d at 953; *Hybritech Inc. v. Abbott Lab.*, 849 F.2d at 1451.

6. "[T]he absence of an adequate showing with regard to any one factor may be sufficient, given the weight or lack of it assigned the other factors, to justify the denial" of a preliminary injunction. *Chrysler Motors Corp.*, 908 F.2d at 953.

### II.

7. Plaintiff has not demonstrated a reasonable likelihood of success on the merits with respect to the central issues of (i) whether the '622 patent is valid and (ii) whether Polysorb infringes Claim 1 of the patent.

■ 8. While patents are presumed valid under 35 U.S.C. § 282,[37] the presumption of validity may be rebutted by clear and convincing evidence of invalidity. Although the party challenging the patent ultimately has the burden of proving such invalidity at trial by clear and convincing evidence, *Hewlett–Packard Co. v. Bausch & Lomb, Inc.*, 909 F.2d 1464, 1467 (Fed.Cir.1990); *N.V. Akzo v. E.I. Du Pont de Nemours & Co.*, 810 F.2d 1148, 1150–51 (Fed.Cir.1987), on this motion for a preliminary injunction, Cyanamid "retain[s] the burden of showing a reasonable likelihood that the attack on [the] patent's validity would fail." *H.H. Robertson, Co. v. United Steel Deck, Inc.*, 820 F.2d at 387. The burden that Cyanamid retains, however, "is determined in the context of the presumptions and burdens that would inhere at trial on the merits." *Id.* at 388 (citation omitted).

9. In this case, Cyanamid has not shown a reasonable likelihood that U.S. Surgical's

---

37. The presumption of validity is premised in part upon the expertise possessed by the Patent and Trademark Office in interpreting the references and its familiarity with the level of ordinary skill in the art. *Bausch & Lomb, Inc. v. Barnes–Hind/Hydrocurve, Inc.*, 796 F.2d 443, 447 (Fed.Cir.1986), *cert. denied*, 484 U.S. 823, 108 S.Ct. 85, 98 L.Ed.2d 47 (1987). It is settled law, moreover, that the statutory "presumption is *nev-*

*er* annihilated, destroyed, or even weakened, regardless of what facts are of record." *ACS Hosp. Sys., Inc. v. Montefiore Hosp.*, 732 F.2d 1572, 1573–74 (Fed.Cir.1984) (emphasis in original) (footnote omitted). Rather, the statutory presumption of validity functions purely as a procedural device assigning to the party asserting invalidity the burden of proving it. *Id.* at 1574.

attack on the validity of the '622 patent will fail.

A.

10. The prerequisites to obtaining a patent are strictly observed. *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 230, 84 S.Ct. 784, 788, 11 L.Ed.2d 661 (1964).

11. The judge-made doctrine of obviousness-type double patenting precludes the issuance of more than one patent having different expiration dates for obvious modifications of the same invention. *Gerber Garment Technology, Inc. v. Lectra Sys., Inc.*, 916 F.2d 683, 686 (Fed.Cir.1990); *Hartness Int'l, Inc. v. Simplimatic Eng'g Co.*, 819 F.2d 1100, 1109 (Fed.Cir.1987); *In re Kaplan*, 789 F.2d 1574, 1579 (Fed.Cir.1986); *In re Longi*, 759 F.2d 887, 892–93 (Fed.Cir.1985). In analyzing a claim of obviousness-type double patenting, a court may use the analytical approach under 35 U.S.C. § 103. *Mirafi, Inc. v. Murphy*, 14 U.S.P.Q.2d (BNA) 1337, 1347, 1989 WL 206491 (W.D.N.C.1989); *see also In re Longi*, 759 F.2d at 892 n. 4.

12. Under 35 U.S.C. § 103, a patented invention must demonstrate ingenuity and skill beyond that possessed by one of ordinary skill in the art. Hence, in considering a claim of obviousness-type double patenting, a court is required to (i) determine the scope and content of the prior art, (ii) ascertain the differences between the claimed invention and the prior art, (iii) determine the level of skill of one of ordinary skill in the art to which the invention pertained at the time the invention was made, and (iv) consider any objective evidence of obviousness or nonobviousness that is presented. *Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966); *Vandenberg v. Dairy Equip. Co.*, 740 F.2d 1560, 1564 (Fed.Cir. 1984).

13. Obviousness is a conclusion of law based upon the above, underlying factual inquiries, *Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 989 (Fed.Cir.1988); *Constant v. Advanced Micro–Devices, Inc.*, 848 F.2d 1560, 1572 (Fed.Cir.), *cert. denied*, 488 U.S. 892, 109 S.Ct. 228, 102 L.Ed.2d 218 (1988); *Bausch & Lomb, Inc. v. Barnes–Hind/Hydrocurve, Inc.*, 796 F.2d 443, 447 (Fed.Cir.1986), *cert. denied*, 484 U.S. 823, 108 S.Ct. 85, 98 L.Ed.2d 47 (1987), all of which assist a court in deciding the question whether the challenged patent ('622) is obvious from the claims of the earlier patent ('948) in light of the prior art material to both patents (moisture-impervious packaging art).

14. The double patenting inquiry requires that only the claims of the '948 patent be considered, except that the specification may be considered to the extent necessary to interpret the terms of the claims. *In re Vogel*, 422 F.2d 438, 441–42 (C.C.P.A. 1970); *see, e.g., Constant v. Advanced Micro–Devices, Inc.*, 848 F.2d at 1571 ("Although the specification may aid the court in interpreting the meaning of the disputed language in the claims, particular embodiments and examples appearing in the specification will not generally be read into the claims." (citations omitted)).

15. Once a court finds that all material elements of the challenged patent existed in the prior art, it is necessary to determine whether the claimed subject matter as a whole would have been obvious to an inventor of ordinary skill in the art. *Union Carbide Corp. v. American Can Co.*, 724 F.2d 1567, 1572 (Fed.Cir.1984). Even if the patent is the first time that the various elements were combined, the combination itself must have been obvious. *Id.* Therefore, "[o]bviousness cannot be established by combining the teachings of the prior art to produce the claimed invention, absent some teaching or suggestion supporting the combination. Under section 103, teachings of references can be combined *only* if there is some suggestion or incentive to do so." *ACS Hosp. Sys., Inc. v. Montefiore Hosp.*, 732 F.2d 1572, 1577 (Fed.Cir.1984) (emphasis in original) (footnotes omitted). In sum, something in the prior art as a whole must suggest to a person skilled in the art the desirability of making the combination.

16. In determining whether the subject matter of the claim was obvious in light of the prior art, the Court hypothesizes " 'the inventor working in his shop with the prior art references—which he is presumed

128

to know—hanging on the walls around him.'" *Union Carbide Corp.*, 724 F.2d at 1576 (quoting *In re Winslow*, 365 F.2d 1017, 1020 (C.C.P.A.1966)).[38]

17. The '622 patent is an obvious modification of the '948 patent claims and is invalid for obviousness-type double patenting. *In re Longi*, 759 F.2d at 892–93.

18. A moisture impervious package containing a synthetic absorbable suture having a moisture level below .25%, the invention claimed by the '622 patent, is an obvious modification to the claimed suture of the now expired '948 patent in view of prior moisture-impervious packaging art, which Cyanamid concedes is prior art.[39] The '622 patent is invalid because it attempts to extend the duration of the patent rights afforded to the '948 patent. *See Gerber Garment Technology, Inc.*, 916 F.2d at 686.

19. If Cyanamid had made a complete disclosure to the Patent Office of the relevance of the '948 patent that a polyglycolic acid suture having a moisture content below .25% would be stable, Cyanamid would have had to disclaim the portion of the patent term of the '622 patent beyond the expiration of the '948 patent. *In re Longi*, 759 F.2d at 894.

B.

20. The '622 patent is also likely to be invalid because it was in public use prior to the critical date of April 29, 1970. 35 U.S.C. § 102(b). The nonexperimental use in surgery of sutures packaged according to the '622 patent prior to this date would constitute a public use bar to patentability. *See United States Envtl. Prods. Inc. v. Westall*, 911 F.2d 713, 715–16 (Fed.Cir.1990); *In re Smith*, 714 F.2d 1127, 1134–35 (Fed.Cir. 1983); *Minnesota Mining & Mfg. Co. v. Research Medical Inc.*, 679 F.Supp. 1037, 1048–49 (D.Utah 1987).

21. The effective filing date of a patent is the date upon which all elements of the claim appear in the application. *Fox Indus. Inc. v. Structural Preservation Sys. Inc.*, 6 U.S.P.Q.2d (BNA) 1577, 1590, 1988 WL 18937 (D.Md.1988), *aff'd*, 922 F.2d 801 (Fed.Cir.1990). The test for sufficiency of support in a parent application is whether the disclosure of that application reasonably conveys to one skilled in the art that the inventor had possession at that time of the later claimed subject application. Whether this requirement of a written description is met under 35 U.S.C. § 112 is a question of fact. *Ralston Purina Co. v. Far–Mar–Co.*, 772 F.2d 1570, 1575 (Fed.Cir.1985).

22. For a disclosure to be inherent, it necessarily must lead one skilled in the art to the critical limitation. *Fox Indus. Inc.*, 6 U.S.P.Q.2d (BNA) at 1590 ("The fact that the later-disclosed material *might* have been surmised from the earlier application is insufficient." (citations omitted) (emphasis in original)).

23. Experimentation is not permitted to derive the disclosure of a critical limitation because this demonstrates that the disclosure is not adequately described. *In re Blaser*, 556 F.2d 534, 538 (C.C.P.A.1977) ("That a person skilled in the art, given [the prior application], might proceed to run a series of experiments and derive a lower limit of 0.6 mols is not a sufficient indication to that person that 0.6 is described as a parameter of appellants' process." (citation omitted)). *But cf. Synthetic Indus. (Tex.), Inc. v. Forta Fibre, Inc.*, 590 F.Supp. 1574, 1578–81 (W.D.Pa.1984) (distinguishing *Blaser* on the facts and finding a minimum amount of experimentation not fatal to a claim's entitlement of the filing date of the first application).

24. The effective filing date of the '622 patent is the filing date of the second '622 application, April 29, 1971, because this was

---

38. The prior art on the wall, however, "consists only of those patents one of ordinary skill in the art would have selected without the advantage of hindsight or knowledge of the invention." *Union Carbide Corp.*, 724 F.2d at 1576 n. 6 (citation omitted).

39. The Court therefore presumes full knowledge by the inventor of the prior moisture-impervious packaging art because it is either within the field of the inventor's endeavor or reasonably pertinent to the particular problem with which the inventor was involved. *Union Carbide Corp.*, 724 F.2d at 1572.

the first disclosure of the critical moisture limitation of the '622 patent, *Ralston Purina Co. v. Far–Mar–Co.,* 772 F.2d at 1575–77; *Blaser,* 556 F.2d at 538, and Glick admitted that the moisture limitation was only entitled to the filing date of the second application. The testimony of Dr. Tanquary, given in rebuttal to support Cyanamid's claim of inherence, only led him to the conclusion that the first application might lead to the critical limitation after running a series of experiments.

25. Public use under 35 U.S.C. § 102(b) occurs when the claimed invention is used more than a year before the filing date of the application by someone other than the inventor who is not under a limitation or obligation of secrecy and not for the purpose of experimentation of the claimed invention. *Grain Processing Corp. v. American Maize–Prods. Co.,* 840 F.2d 902, 906 (Fed.Cir.1988); *see also City of Elizabeth v. American Nicholson Pavement Co.,* 97 U.S. 126, 134, 24 L.Ed. 1000 (1878) ("The use of an invention by the inventor himself, or of any other person under his direction, by way of experiment, and in order to bring the invention to perfection, has never been regarded" as a public use.); *TP Lab., Inc. v. Professional Positioners, Inc.,* 724 F.2d 965, 970–73 (Fed. Cir.1984).

26. For there to be an experimental use, any experimentation that did occur must relate to the claimed invention, *RCA Corp. v. Data Gen. Corp.,* 887 F.2d 1056, 1061–62 (Fed.Cir.1989); *Pennwalt Corp. v. Akzona, Inc.,* 740 F.2d 1573, 1580–81 (Fed.Cir.1984), and must not be for the purpose of commercial exploitation. If, however, "any commercial exploitation does occur, it must be merely incidental to the primary purpose of experimentation to perfect the invention." *Id.* at 1581 (citations omitted).

27. That the clinical uses were conducted after the invention was reduced to practice in June 1968 is by itself sufficient to conclude that the clinical uses were not ex-

perimental. *RCA Corp. v. Data Gen. Corp.,* 887 F.2d at 1061.

28. Factors that are considered in determining whether a use is experimental include the nature of the clinical trials; whether the inventor retained control over the clinical trials; and whether the participants were placed under any limitation or obligation of confidentiality. *Baker Oil Tools, Inc. v. Geo Vann, Inc.,* 828 F.2d 1558, 1564 (Fed.Cir. 1987); *In re Brigance,* 792 F.2d 1103, 1107–08 (Fed.Cir.1986).

29. In view of U.S. Surgical's prima facie showing of public use, all inferences presently weigh against Cyanamid's contention that the evidence of public use describes an experimental use, *cf. Interstate Circuit, Inc. v. United States,* 306 U.S. 208, 226, 59 S.Ct. 467, 474, 83 L.Ed. 610 (1939), because any such evidence, if it exists, is peculiarly within Cyanamid's control.

III.

30. The Plaintiff bears the burden of proving that the accused device infringes Claim 1 of the '622 patent. *Eltech Sys. Corp. v. PPG Indus., Inc.,* 903 F.2d 805, 809 (Fed.Cir.1990); *ZMI Corp. v. Cardiac Resuscitator Corp.,* 844 F.2d 1576, 1578–81 (Fed.Cir.1988); *Rite–Hite Corp. v. Kelley Co.,* 819 F.2d 1120, 1123 (Fed.Cir.1987); *Lemelson v. United States,* 752 F.2d 1538, 1547 (Fed.Cir.1985). In its patent infringement analysis, a court must construe the claim to determine its proper scope and then decide whether the claim as interpreted encompasses the accused device. *SRI Int'l v. Matsushita Elec. Corp. of Am.,* 775 F.2d 1107, 1118 (Fed.Cir.1985) ("It is only *after* the claims have been *construed without reference to the accused device* that the claims, as so construed, are applied to the accused device to determine infringement." (emphasis in original) (citation omitted)); *ZMI Corp.,* 844 F.2d at 1578. Infringement is thus determined by comparing the accused device with the properly interpreted claims in suit. *See Lemelson,* 752 F.2d at 1548–49.[40] A claim is literally infringed if every element of the claim is

40. Whether an accused product is patented does not affect the question whether that product infringes the earlier patent of another. *Cf. Atlas* *Powder Co. v. E.I. Du Pont de Nemours & Co.,* 750 F.2d 1569, 1580–81 (Fed.Cir.1984).

found in the accused device. *See ZMI Corp.*, 844 F.2d at 1578; *see also Texas Instruments, Inc. v. United States Int'l Trade Comm'n*, 805 F.2d 1558, 1562 (Fed.Cir.1986) ("Literal infringement requires that the accused device embody every element of the claim as properly interpreted." (citations omitted)).

31. In making a determination regarding infringement, the Court will give the terms in a claim their ordinary meaning, unless it appears from the patent and its file history that the inventor used such terms differently. *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1387 (Fed.Cir.1992); *ZMI Corp.*, 844 F.2d at 1579–80; *Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753, 759–60 (Fed.Cir.1984).

32. The '622 patent claims a package comprising a "surgical element" having a moisture content at or less than .25%. The ordinary meaning of the term "surgical element" cannot reasonably be interpreted to refer only to the polymer component unless that polymer is the only component of the surgical element. The plain language of the claim refers to the entire surgical element or suture, that which is used by the surgeon, and includes all of the components of the surgical element. This ordinary and accustomed meaning of this term governs unless the inventor indicated through the patent and its file history that a different meaning was intended. *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d at 1388 ("Where an inventor chooses to be his own lexicographer and to give terms uncommon meanings, he must set out his uncommon definition in some manner within the patent disclosure." (citation omitted)); *ZMI Corp.*, 844 F.2d at 1579.

33. The claim language, the other claims, the prior art, the patent specification,[41] the prosecution history, and the understanding of those skilled in the art are all relevant in determining whether the inventor intended a meaning other than the ordinary

and accustomed meaning of the claim. *See SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1118 (Fed.Cir.1985); *McGill Inc. v. John Zink Co.*, 736 F.2d 666, 672–75 (Fed.Cir.), *cert. denied*, 469 U.S. 1037, 105 S.Ct. 514, 83 L.Ed.2d 404 (1984). "Where the meaning of words in a claim is in dispute, or where different members of the community of those skilled in the art give the same term different meanings, the specification and prosecution history can provide relevant information about the scope and meaning of the claim." *Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 987 (Fed.Cir.1988) (citation omitted).

34. In this case, the '622 patent and its prosecution history, the credible expert testimony, and Cyanamid's conduct reinforce the ordinary understanding of the claim language, i.e., that the term "surgical element" was intended to mean the entire surgical element and not just the polymeric component within the surgical element. Hence, when determining the moisture content of the surgical element, all components of the surgical element are considered.

35. For example, the claim language differentiates the surgical element and the polymer, and this difference in language cannot be disregarded as meaningless, *General Elec. Co. v. United States*, 572 F.2d 745, 753 (Ct. Cl.1978), especially since the patent specification expressly states that the surgical element may contain components other than the polymer and therefore contemplates the measurement and consideration of the moisture content of all of the components of the suture. *Cf. Specialty Composites v. Cabot Corp.*, 845 F.2d at 987.

36. The moisture tests described in the '622 patent can determine only the moisture content of the entire suture. Although proof of infringement is not limited to methods in existence on the date of the invention, "the state of the art of measurement in a particular field [ (especially if disclosed in the patent itself) ] may be highly relevant in construing a patent and determining the

---

41. "The descriptive part of the specification aids in ascertaining the scope and meaning of the claims inasmuch as the words of the claims must be based upon the description. The specification

is, thus, the primary basis for construing the claims." *Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448, 452 (Fed.Cir.1985).

scope of its claims." *Cosden Oil & Chem. Co. v. American Hoechst Corp.*, 543 F.Supp. 522, 530 (D.Del.1982).

37. In addition, the fact that Cyanamid characterized the moisture content of the claim in terms of the polymer and then amended the claim to characterize the moisture content in terms of the surgical element evidences an intent that the terms "polymer" and "surgical element" were to have different meanings. *ZMI Corp.*, 844 F.2d at 1580.

38. The moisture content of Polysorb is more than twice the upper limit of the claim, and Polysorb therefore does not infringe the '622 patent.

39. Even if the term "surgical element" was interpreted to mean only the polymer component of the suture as urged by Cyanamid, the evidence fails to establish that the moisture content of Polysorb is at or below .25%.

40. Thus, U.S. Surgical's Polysorb suture does not infringe the '622 patent.

IV.

41. In ruling on a motion for a preliminary injunction, a court must decide "whether irreparable harm to the movant will result from denial" of the motion. *Illinois Tool Works, Inc.*, 906 F.2d at 682.

42. Irreparable harm is harm that cannot be compensated in money damages. *Hybritech Inc. v. Abbott Lab.*, 849 F.2d 1446, 1456–57 (Fed.Cir.1988).

43. A patentee is entitled to a presumption of irreparable harm only when it has made a "strong showing" of a likelihood of success on the merits. *H.H. Robertson Co. v. United Steel Deck, Inc.*, 820 F.2d 384, 390 (Fed.Cir.1987); *Smith Int'l, Inc. v. Hughes Tool Co.*, 718 F.2d 1573, 1581 (Fed. Cir.), *cert. denied*, 464 U.S. 996, 104 S.Ct. 493, 78 L.Ed.2d 687 (1983); *Atlas Powder Co. v. Ireco Chems.*, 773 F.2d 1230, 1233 (Fed.Cir.1985); *Chrysler Motors Corp.*, 908 F.2d at 954; *Illinois Tool Works, Inc.*, 906

F.2d at 682–83. The presumption, moreover, "requires at a minimum a strong showing of both patent validity and infringement." *Chrysler Motors Corp.*, 908 F.2d at 954 (citations omitted).

44. Here, the Plaintiff has not made the requisite strong showing. Indeed, the Plaintiff has not shown a reasonable likelihood of success on the issues of validity and infringement.

45. Since there is no basis in the record for the presumption of irreparable harm, the Plaintiff bears the burden of proving the irreparable nature of the harm claimed. *See Chrysler Motors Corp.*, 908 F.2d at 954.[42]

46. In considering a claim of irreparable harm, the Court may consider a variety of factors, such as: (1) whether the field of technology covered by the patent was new; (2) whether there was substantial competition in this field; (3) whether the alleged infringer was a large presence in the field; (4) whether technology changes fairly quickly in the field; (5) whether substantial research was being done; (6) whether the patent would help establish the patentee's market position; (7) whether the value of the patent would be gone at the end of the litigation; (8) whether the injury was unpredictable; and (9) whether the absence of an injunction would encourage infringement. *Hybritech Inc. v. Abbott Lab.*, 4 U.S.P.Q.2d (BNA) 1001, 1014–15, 1987 WL 123997 (C.D.Cal.1987), *aff'd*, 849 F.2d 1446, 1456 (Fed.Cir.1988).

47. The record does not contain evidence that Cyanamid will suffer irreparable harm due to U.S. Surgical. The injury Cyanamid is claiming—loss of sales, profits and market share—is not irreparable. Loss of sales or profits historically and traditionally is not irreparable harm. *See Illinois Tool Works, Inc.*, 906 F.2d at 683; *Lucasey Mfg. Corp. v. Anchor Pad Int'l, Inc.*, 698 F.Supp. 190, 192 (N.D.Cal.1988) ("It is clear that mere financial injury does not constitute irreparable harm if adequate compensatory re-

---

42. Even in cases where the presumption of irreparable harm applies, it can be rebutted by the factual record. *Illinois Tool Works, Inc.*, 906 F.2d at 681–82; *see also Rosemount, Inc. v. U.S. Int'l Trade Comm'n*, 910 F.2d 819, 822 (Fed.Cir.

1990) ("a *presumption* of irreparable harm to a patent owner does not override the evidence of record" (citations omitted) (emphasis in original)); *Roper Corp. v. Litton Sys., Inc.*, 757 F.2d 1266, 1272 (Fed.Cir.1985).

lief will be available in the course of litigation." (citations omitted)); *Hybritech Inc. v. Abbott Lab.*, 4 U.S.P.Q.2d (BNA) at 1014 ("So irreparable harm must be something more than just the money damages suffered by the losing party."); *cf. Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72–73 (2d Cir.1979). While some courts have recognized that the availability of damages to remedy some of the harm does not preclude injunctive relief, *Hybritech Inc. v. Abbott Lab.*, 4 U.S.P.Q.2d (BNA) at 1015; *Oscar Mayer Foods Corp. v. Sara Lee Corp.*, 15 U.S.P.Q.2d (BNA) 1204, 1211, 1990 WL 114745 (W.D.Wis.1990) (loss of market share and loss of investment in new product sufficient to find irreparable harm), the Federal Circuit has also declared that it would disserve the patent system either to find (i) that a patentee is always irreparably injured by an alleged infringer's pretrial sales or (ii) that no patentee could ever be irreparably harmed when an alleged infringer is capable of responding in damages. *Illinois Tool Works, Inc.*, 906 F.2d at 683; *cf. Foundry Servs., Inc. v. Beneflux Corp.*, 206 F.2d 214, 216 (2d Cir.1953) (although reducing plaintiff's sales, defendant's continued competition pending a trial does not constitute irreparable injury, since any loss could be adequately redressed by money damages). As such, a court is bound to make its findings on the issue of irreparable harm on a case-by-case basis.

■ 48. Since market share is measured by sales, money damages are generally ascertainable for the loss of market share. *See Frommelt Indus., Inc. v. W.B. McGuire Co.*, 504 F.Supp. 1180, 1184 (N.D.N.Y.1981). In some circumstances (not present here however because of the licensing arrangement (*supra* at n. 34 & *infra*)), lost sales of related non-patented products as a result of sales of alleged infringing products may constitute irreparable harm. *Spalding & Evenflo Co. v. Acushnet Co.*, 2 U.S.P.Q.2d (BNA) 1070, 1071, 1986 WL 83435 (D.Mass.1986). The Plaintiff in such an instance must still, how-

ever, show "that its patent is valid and infringed …," *id.* at 1072, which is not the case here.

■ 49. In effect, Cyanamid licensed the '622 patent to Johnson & Johnson. The Federal Circuit has recognized that the presumption of irreparable harm, if existent, is rebutted by evidence that a patent holder has licensed its patent to another. *T.J. Smith & Nephew Ltd. v. Consolidated Medical Equip., Inc.*, 821 F.2d 646, 648 (Fed.Cir. 1987). When a patent holder licenses its patent to another company, it gives up the right to exclusivity. Furthermore, "in instances where the patent holder has not demonstrated a reasonable likelihood of success on the merits, but has licensed its patent to another, monetary damages can sufficiently compensate the patent holder for infringement occurring during the course of the litigation." *Illinois Tool Works, Inc.*, 906 F.2d at 683 (citation omitted); *see also Crucible Materials Corp. v. Sumitomo Special Metals Co.*, 719 F.Supp. 14, 17 (D.D.C.1989).[43]

50. Here, the facts do not support the Plaintiff's claim of irreparable harm. The evidence established that (a) Cyanamid surrendered market share to Johnson & Johnson in 1978, and its market position has been steadily declining; (b) the '622 patent covers technology that is more than 20 years old, and the market has seen neither innovation nor competition during that time; (c) the synthetic absorbable suture, although a significant product to Davis & Geck, is not a significant product to Cyanamid; (d) Cyanamid has not persuaded the Court that Davis & Geck will likely be forced out of business during the pendency of this action because of U.S. Surgical's entry or that Cyanamid will suffer market losses disproportionately to Johnson & Johnson; and (e) U.S. Surgical is capable of readily compensating Cyanamid for any monetary loss. In light of these facts, and the factual record taken as a whole, there is no irreparable harm. *Com-*

---

**43.** A plaintiff's status as a licensor, however, does not necessarily preclude a finding of irreparable harm in all cases nor does it foreclose a court from granting preliminary, injunctive relief in appropriate circumstances. *Johnson & John-* *son Consumer Prods. Inc. v. Ormco Corp.*, Nos. 87–341 & 87–547, 1988 WL 155634, at *7 (D.Del. Sept. 29, 1988) (citing *Atlas Powder Co. v. Ireco Chems.*, 773 F.2d 1230, 1233 (Fed.Cir. 1985)).

pare *Illinois Tool Works, Inc.,* 906 F.2d at 683 *with Hybritech Inc.,* 849 F.2d at 1456–57.

## V.

**** 51. Preliminary injunctions are drastic remedies. In deciding whether to grant a preliminary injunction, the Court must weigh the hardship imposed on the Plaintiff resulting from the denial of a preliminary injunction against the hardship that the Defendant will incur if the injunction is granted. *H.H. Robertson Co.,* 820 F.2d at 390 ("The magnitude of the threatened injury to the patent owner is weighed, in the light of the strength of likelihood of success on the merits, against the injury to the accused infringer if the preliminary decision is in error."). As the Federal Circuit has recognized, "[t]he hardship on a preliminarily enjoined manufacturer who must withdraw its product from the market before trial can be devastating." *Illinois Tool Works, Inc.,* 906 F.2d at 683.

52. Hence, if a preliminary injunction would have a more severe impact on the enjoined party than the moving party would suffer if not granted, that can be a basis for denying the injunction. *Illinois Tool Works, Inc.,* 906 F.2d at 683 ("Yet, a court must remain free to deny a preliminary injunction, whatever be the showing of likelihood of success, when equity in the light of all the factors so requires." (citation omitted)); *cf. Litton Sys., Inc. v. Sundstrand Corp.,* 750 F.2d 952, 959 (Fed.Cir.1984).

**** 53. In this case, U.S. Surgical has entered a market that was previously dominated by two companies. In doing so, it and its employees have made investments in research, training, and the evaluation of customer needs. If U.S. Surgical is prohibited from selling Polysorb pending a full trial on the merits, not only would these investments be wasted, but, significantly, its nonaccused but related nonsynthetic absorbable and non-absorbable sutures would not sell in the market because of the importance of a synthetic absorbable suture to the entire suture line and because of the bundling phenomenon within the suture line at hospital purchasing departments, and there would be adverse effects on U.S. Surgical's employees and U.S. Surgical's customer relationships.

54. Here, the impact of a preliminary injunction on U.S. Surgical would be more severe and certain than the injury to Cyanamid if such an injunction were denied. Any loss to Cyanamid during the pendency of this action will be compensable in money damages if Cyanamid later prevails on the merits. Cyanamid, moreover, would not be prohibited from selling its sutures. In contrast, if the preliminary injunction were granted and U.S. Surgical was ultimately successful on the merits, it could not be adequately compensated for its losses in reputation and ability to compete. Nor could anyone compensate it or its employees for their financial harm. This harm to U.S. Surgical is a significant factor weighing against the relief sought. *See Illinois Tool Works, Inc.,* 906 F.2d at 683; *see Datascope Corp. v. Kontron, Inc.,* 611 F.Supp. 889, 895 (D.Mass.1985) (defendant's showing of irreparable harm if a preliminary injunction was granted when plaintiff has shown no comparable harm militates against granting the injunction), *aff'd,* 786 F.2d 398 (Fed.Cir.1986).

## VI.

55. The patent laws are designed to preserve a delicate balance between the need to promote technological advances through the inventive process and simultaneously to preserve unimpeded competition in the marketplace. *Sears, Roebuck & Co. v. Stiffel Co.,* 376 U.S. 225, 230–31, 84 S.Ct. 784, 788–89, 11 L.Ed.2d 661 (1964).

**** 56. The public has a strong interest in encouraging research and development by protecting valid patents under the law. Hence, the public interest in a patent case is advanced by protecting the rights of the patent holder. *Smith Int'l, Inc.,* 718 F.2d at 1581. The Federal Circuit, however, has rejected the notion "that the public interest inevitably lies on the side of the patent owner because of the public interest in protecting patent rights, although that is one factor to consider and may be the dominant factor." *Rosemount, Inc.,* 910 F.2d at 822.

57. In this case there are two other public interest considerations: the elimination of jobs and the availability of all of U.S. Surgical's new sutures.

58. Polysorb has spurred interest from numerous hospitals and doctors, who see it potentially as an innovative product with advantages over the previously existing products. Some surgeons have expressed a preference for Polysorb as well as U.S. Surgical's other suture products. As one court has recognized, "the public will be harmed by an injunction [if] some physicians prefer" the accused medical or surgical product. *Datascope Corp.*, 611 F.Supp. at 895.

59. The proposed injunction would force U.S. Surgical to lay off many employees and would leave doctors and hospitals without U.S. Surgical sutures. These factors suggest that an injunction would not serve the public interest. *See Archive Corp. v. Cipher Data Prods., Inc.*, 12 U.S.P.Q.2d (BNA) 1464, 1469, 1988 WL 168533 (C.D.Cal.1988); *Rohm & Haas Co. v. Mobil Oil Corp.*, 525 F.Supp. 1298, 1308 (D.Del.1981).

60. Furthermore, denial of the injunction would maintain the status quo and enable U.S. Surgical to continue to compete in the suture market. *See Litton Sys., Inc.*, 750 F.2d at 961.

▮ 61. Competition in a marketplace is desirable. *See Litton Sys., Inc.*, 750 F.2d at 961. U.S. Surgical is a new entrant in a market that has been dominated for years by two companies who have cross-licensed each other and who sell the principal suture product (synthetic absorbable) under the teachings of a single patent. Where, as here, the Plaintiff has not made a strong showing that it will succeed on the merits, the balance between the rights granted by the patent system and free competition "should be struck in favor of competition." *Ampex Corp. v. Abekas Video Sys., Inc.*, 15 U.S.P.Q.2d (BNA) 1219, 1224, 1990 WL 120750 (N.D.Cal.1990).

## CONCLUSION

For all of the foregoing reasons, the Plaintiff's motion for a preliminary injunction (Document No. 9) is denied.

SO ORDERED.